******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* NINA C. BACCALA
(SC 19717)

Rogers, C. J., and Palmer, Eveleigh, McDonald, Espinosa, Robinson and
D'Auria, Js.*

*Syllabus*

Convicted of the crime of breach of the peace in the second degree in
connection with the defendant's customer service dispute with a super-
market employee, the defendant appealed, claiming that the evidence
was insufficient to support her conviction in accordance with her first
amendment rights. The defendant telephoned a supermarket to inquire
whether its customer service desk was open, and, after being informed
during that call by F, an assistant manager, that the desk had already
closed for the evening and that F would be unable to process her money
transfer request, the defendant proceeded to utter various swear words.
After the defendant arrived at the supermarket, F approached the defen-
dant and again informed her that the customer service desk was closed.
The defendant became angry and then proceeded to loudly direct crude
and angry comments at F, including "fat ugly bitch, "cunt," and "fuck
you, you're not a manager," while making gestures with a cane that she
was carrying. F remained professional and wished the defendant a good
night, which prompted the defendant to leave the supermarket. Follow-
ing her conviction, the defendant appealed. *Held* that the defendant's
conviction of breach of the peace in the second degree on the basis of
pure speech constituted a violation of the first amendment to the United
States constitution, as the defendant's speech, unaccompanied by
threats, did not fall within the narrow category of unprotected fighting
words, the state having failed to prove beyond a reasonable doubt
that F was likely to have retaliated with violence in response to the
defendant's words under the circumstances in which they were uttered,
and, accordingly, the judgment of the trial court was reversed and the
case was remanded with direction to render a judgment of acquittal;
this court, utilizing the proper contextual analysis that required consider-
ation of the actual circumstances, as perceived by a reasonable speaker
and addressee, concluded that an average store manager in F's position
would not have responded to the defendant's remarks with violence, F,
having previously heard the defendant's crude tirade during the tele-
phone call, understood that when she approached the defendant to
reiterate a message she knew the defendant did not want to hear, would
reasonably have been aware of the possibility that a similar barrage
of insults would be directed at her, and, as the acting manager of a
supermarket, F was expected to model appropriate, responsive behavior
aimed at diffusing the situation and would have had a degree of control
over the premises where the confrontation took place.

(*Three justices concurring and dissenting in one opinion*)

Argued November 10, 2016—officially released July 11, 2017

*Procedural History*

Substitute information charging the defendant with
two counts of the crime of threatening in the second
degree and one count of the crime of breach of the
peace in the second degree, brought to the Superior
Court in the judicial district of Tolland, geographical
area number nineteen, and tried to the jury before *Gra-
ham, J.*; verdict and judgment of guilty of breach of the
peace in the second degree, from which the defendant
appealed. *Reversed; judgment directed.*

*Damian K. Gunningsmith*, with whom were *John
L. Cordani, Jr.*, and, on the brief, *Martin B. Margulies*,
for the appellant (defendant).

*Mitchell S. Brody*, senior assistant state's attorney, with whom, on the brief, were *Matthew C. Gedansky*, state's attorney, and *Andrew R. Durham*, assistant state's attorney, for the appellee (state).

*Opinion*

McDONALD, J. The defendant, Nina C. Baccala, was convicted of breach of the peace in the second degree in violation of General Statutes § 53a-181 (a) (5)[1] solely on the basis of the words that she used to denigrate the manager of a supermarket in the course of a customer service dispute. Fundamentally, we are called upon to determine whether the defendant's speech is protected under the first amendment to the United States constitution or, rather, constitutes criminal conduct that a civilized and orderly society may punish through incarceration. The distinction has profound consequences in our constitutional republic. "If there is a bedrock principle underlying the [f]irst [a]mendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas* v. *Johnson*, 491 U.S. 397, 414, 109 S. Ct. 2533, 105 L. Ed. 2d 342 (1989).

Only certain types of narrowly defined speech are not afforded the full protections of the first amendment, including "fighting words," i.e., those words that "have a direct tendency to cause acts of violence by the person to whom, individually, the remark is addressed." (Internal quotation marks omitted.) *Chaplinsky* v. *New Hampshire*, 315 U.S. 568, 573, 62 S. Ct. 766, 86 L. Ed. 1031 (1942). The broad language of Connecticut's breach of the peace statute; see footnote 1 of this opinion; has been limited accordingly. See *State* v. *Indrisano*, 228 Conn. 795, 812, 640 A.2d 986 (1994). Because the words spoken by the defendant were not likely to provoke a violent response under the circumstances in which they were uttered, they cannot be proscribed consistent with the first amendment. Accordingly, we reverse the judgment of the trial court.[2]

The jury reasonably could have found the following facts. On the evening of September 30, 2013, the defendant telephoned the Stop & Shop supermarket in Vernon to announce that she was coming to pick up a Western Union money transfer so they would not close the customer service desk before she arrived. The defendant spoke with Tara Freeman, an experienced assistant store manager who was in charge of the daily operations at the supermarket, which spanned approximately 65,000 square feet. Freeman informed the defendant that the customer service desk already had closed and that she was unable to access the computer that processed Western Union transactions. The defendant became belligerent, responded that she "really didn't give a shit," and called Freeman "[p]retty much every swear word you can think of" before the call was terminated.

Despite Freeman's statements to the contrary, the defendant believed that as long as she arrived at the supermarket before 10 p.m., she should be able to

obtain the money transfer before the customer service desk closed. Accordingly, a few minutes after she telephoned, the defendant arrived at the supermarket, which was occupied by customers and employees. The defendant proceeded toward the customer service desk located in proximity to the registers for grocery checkout and began filling out a money transfer form, even though the lights at the desk were off. Freeman approached the defendant, a forty year old woman who used a cane due to a medical condition that caused severe swelling in her lower extremities, and asked her if she was the person who had called a few minutes earlier. Although the defendant denied that she had called, Freeman recognized her voice. After Freeman informed the defendant, as she had during the telephone call, that the customer service desk was closed, the defendant became angry and asked to speak with a manager. Freeman replied that she was the manager and pointed to her name tag and a photograph on the wall to confirm her status. Some employees, including the head of the cashier department, Sarah Luce, were standing nearby as this exchange took place.

The defendant proceeded to loudly call Freeman a "fat ugly bitch" and a "cunt,"[3] and said "fuck you, you're not a manager," all while gesticulating with her cane. Despite the defendant's crude and angry expressions directed at her, Freeman remained professional. She simply responded, "[h]ave a good night," which prompted the defendant to leave the supermarket.

Thereafter, the defendant was arrested and charged with breach of the peace in the second degree.[4] Following a jury trial, the defendant was convicted of that charge and sentenced to twenty-five days incarceration. The defendant appealed, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2.

On appeal, the defendant claims that the evidence was insufficient to support her conviction of breach of the peace in the second degree because the words she uttered to Freeman did not constitute fighting words. Although the defendant asserts that her speech is protected under the first amendment to the federal constitution, her principal argument is that we should construe article first, §§ 4 and 5, of the Connecticut constitution to provide greater free speech protection than the first amendment so as to limit the fighting words exception to express invitations to fight. We conclude that it is unnecessary to decide whether the state constitution would afford greater protection because the evidence was plainly insufficient to support the defendant's conviction under settled federal constitutional jurisprudence.[5]

This court has not considered the scope and application of the fighting words exception for more than two decades. See *State* v. *Szymkiewicz*, 237 Conn. 613, 678

A.2d 473 (1996). Accordingly, it is appropriate for us to consider the exception's roots and its scope in light of more recent jurisprudential and societal developments.

The fighting words exception was first articulated in the seminal case of *Chaplinsky* v. *New Hampshire*, supra, 315 U.S. 568. After noting that the right of free speech is not absolute, the United States Supreme Court broadly observed: "There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any [c]onstitutional problem. These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." (Footnote omitted.) Id., 571–72.

Unlike George Carlin's classic 1972 comedic monologue, "Seven Words You Can Never Say on Television,"[6] it is well settled that there are no per se fighting words. See *Downs* v. *State*, 278 Md. 610, 615, 366 A.2d 41 (1976). Although certain language in *Chaplinsky* seemed to suggest that some words in and of themselves might be inherently likely to provoke the average person to violent retaliation, such as "God damned racketeer" and "damned Fascist"; (internal quotation marks omitted) *Chaplinsky* v. *New Hampshire*, supra, 315 U.S. 569, 574; subsequent case law eschewed the broad implications of such a per se approach. See *People* v. *Stephen*, 153 Misc. 2d 382, 387, 581 N.Y.S.2d 981 (1992) ("[w]hile the original *Chaplinsky* formulation of 'fighting words' may have given some impression of establishing a category of words which could be proscribed regardless of the context in which they were used, developing [f]irst [a]mendment doctrine in the half century since *Chaplinsky* was decided has continually resorted to analyzing provocative expression contextually"); see also *Texas* v. *Johnson*, supra, 491 U.S. 409; *Gooding* v. *Wilson*, 405 U.S. 518, 525, 92 S. Ct. 1103, 31 L. Ed. 2d 408 (1972); *Cohen* v. *California*, 403 U.S. 15, 20, 23, 91 S. Ct. 1780, 29 L. Ed. 2d 284 (1971); L. Tribe, American Constitutional Law (2d Ed. 1988) § 12-10, pp. 850–51. Rather, "words may or may not be 'fighting words,' depending upon the circumstances of their utterance." *Lewis* v. *New Orleans*, 415 U.S. 130, 135, 94 S. Ct. 970, 39 L. Ed. 2d 214 (1974) (Powell, J., concurring); see *R. A. V.* v. *St. Paul*, 505 U.S. 377, 432, 112 S. Ct. 2538, 120 L. Ed. 2d 305 (1992) (Stevens, J., concurring) ("[w]hether words are fighting words is determined in part by their context"); *Hammond* v. *Adkisson*, 536 F.2d 237, 239 (8th Cir. 1976) (first amendment requires "determination that the words were used 'under such circumstances' that they were likely to arouse to immediate and violent anger the person to whom the words were addressed" [emphasis omitted]); *State* v. *Szymkiewicz*, supra, 237 Conn. 620 (considering both "the words used by the defendant" and "the circumstances in which they were used"); *State* v. *Hoskins*, 35 Conn.

Supp. 587, 591, 401 A.2d 619 (1978) ("The 'fighting words' concept has two aspects. One involves the quality of the words themselves. The other concerns the circumstances under which the words are used.").

This context based view is a logical reflection of the way the meaning and impact of words change over time. See *R.I.T.* v. *State*, 675 So. 2d 97, 99 (Ala. Crim. App. 1995); *People* v. *Stephen*, supra, 153 Misc. 2d 387; *State* v. *Harrington*, 67 Or. App. 608, 613 n.5, 680 P.2d 666, cert. denied, 297 Or. 547, 685 P.2d 998 (1984); see also *Towne* v. *Eisner*, 245 U.S. 418, 425, 38 S. Ct. 158, 62 L. Ed. 372 (1918) ("[a] word is not a crystal, transparent and unchanged, it is the skin of a living thought and may vary greatly in color and content according to the circumstances and the time in which it is used"). While calling someone a racketeer or a fascist might naturally have invoked a violent response in the 1940s when *Chaplinsky* was decided, those same words would be unlikely to even raise an eyebrow today. Since that time, public discourse has become more coarse. "[I]n this day and age, the notion that *any* set of words are so provocative that they can reasonably be expected to lead an average listener to immediately respond with physical violence is highly problematic." (Emphasis in original.) *State* v. *Tracy*, 200 Vt. 216, 237, 130 A.3d 196 (2015); accord *People in the Interest of R.C.*, Docket No. 14CA2210, 2016 WL 6803065, *4 (Colo. App. November 17, 2016). We need not, however, consider the continued vitality of the fighting words exception in the present case because a contextual examination of the circumstances surrounding the defendant's remarks inexorably leads to the conclusion that they were not likely to provoke a violent response and, therefore, were not criminal in nature or form.

A proper contextual analysis requires consideration of the actual circumstances as perceived by a reasonable speaker and addressee to determine whether there was a likelihood of violent retaliation. See *Texas* v. *Johnson*, supra, 491 U.S. 409; *Lewis* v. *New Orleans*, supra, 415 U.S. 135 (Powell, J., concurring); *Gooding* v. *Wilson*, supra, 405 U.S. 528; *Cohen* v. *California*, supra, 403 U.S. 20, 23. This necessarily includes a consideration of a host of factors.

For example, the manner and circumstances in which the words were spoken bears on whether they were likely to incite a violent reaction. Even the court in *Chaplinsky* acknowledged that words which are otherwise profane, obscene, or threatening might not be deemed fighting words if said with a " 'disarming smile.' " *Chaplinsky* v. *New Hampshire*, supra, 315 U.S. 573; see also *Lamar* v. *Banks*, 684 F.2d 714, 718–20 (11th Cir. 1982) (remanding for evidentiary hearing because there was no factual record as to circumstances in which alleged fighting words were made, noting that "the tone of voice may have been jocular rather than

hostile, and we do not know . . . what the rest of the conversation was like"); *State* v. *Harrington*, supra, 67 Or. App. 613 n.5 ("Forms of expression vary so much in their contexts and inflections that one cannot specify particular words or phrases as being always fighting. What is gross insult in one setting is crude humor in another." [Internal quotation marks omitted.]). The situation under which the words are uttered also impacts the likelihood of a violent response. See, e.g., *Klen* v. *Loveland*, 661 F.3d 498, 510 (10th Cir. 2011) (considering that words were spoken in context of plaintiffs' attempts to obtain building permit and that city employee addressees "did not consider the . . . behavior particularly shocking or memorable, given the rough-and-tumble world of the construction trade"); *People* v. *Prisinzano*, 170 Misc. 2d 525, 531–32, 648 N.Y.S.2d 267 (1996) (considering that words were spoken by union worker to several replacement workers during course of labor dispute); *Seattle* v. *Camby*, 104 Wn. 2d 49, 54, 701 P.2d 499 (1985) (en banc) ("Looking at the actual situation presented in this case, we find an intoxicated defendant being escorted out of a restaurant by a mild mannered, unaroused doorman-host with a police officer present. Given the specific context in which the words were spoken, it was not plainly likely that a breach of the peace would occur."). Thus, whether the words were preceded by a hostile exchange or accompanied by aggressive behavior will bear on the likelihood of such a reaction. See *State* v. *Szymkiewicz*, supra, 237 Conn. 615–16; *Landrum* v. *Sarratt*, 352 S.C. 139, 143, 572 S.E.2d 476 (App. 2002); see also *State* v. *James M.*, 111 N.M. 473, 476, 806 P.2d 1063 (App. 1990) (noting that fighting words were uttered during course of hostile argument), cert. denied, 111 N.M. 529, 807 P.2d 227 (1991); *In re S.J.N-K.*, 647 N.W.2d 707, 709 (S.D. 2002) (noting that fighting words were uttered in course of speaker's vehicle tailgating addressee's vehicle as latter drove away from scene).

A proper examination of context also considers those personal attributes of the speaker and the addressee that are reasonably apparent because they are necessarily a part of the objective situation in which the speech was made. See *In re Nickolas S.*, 226 Ariz. 182, 188, 245 P.3d 446 (2011); *State* v. *John W.*, 418 A.2d 1097, 1104 (Me. 1980); *Seattle* v. *Camby*, supra, 104 Wn. 2d 54. Courts have, for example, considered the age, gender, race, and status of the speaker. See, e.g., *Lewis* v. *New Orleans*, supra, 415 U.S. 135 (Powell, J., concurring) ("[i]t is unlikely . . . that the words said to have been used . . . would have precipitated a physical confrontation between the middle-aged woman who spoke them and the police officer in whose presence they were uttered"); *Hammond* v. *Adkisson*, supra, 536 F.2d 240 ("the trier of fact might well conclude . . . that there was no likelihood that a [nineteen year old] young woman's words would provoke a violent response from

the particular officer involved"); *In re Nickolas S.*, supra, 188 (determining there was no likelihood of violent response when student addressed coarse remark to teacher in classroom); *In re Spivey*, 345 N.C. 404, 414–15, 480 S.E.2d 693 (1997) (holding that racial slur directed at African-American man by white man will cause "hurt and anger" and "often provoke him to confront the white man and retaliate"). Indeed, common sense would seem to suggest that social conventions, as well as special legal protections, could temper the likelihood of a violent response when the words are uttered by someone less capable of protecting themselves, such as a child, a frail elderly person, or a seriously disabled person.[7]

Although the United States Supreme Court has observed that the speech must be of such a nature that it is "likely to provoke the *average* person to retaliation"; (emphasis added; internal quotation marks omitted) *Texas* v. *Johnson*, supra, 491 U.S. 409; when there are objectively apparent characteristics that would bear on the likelihood of such a response, many courts have considered the average person with those characteristics. Thus, courts also have taken into account the addressee's age, gender, and race. See, e.g., *Bethel* v. *Mobile*, Docket No. 10-0009-CG-N, 2011 WL 1298130, *7 (S.D. Ala. April 5, 2011) ("[t]here can be little doubt that repeatedly calling a [thirteen year old] girl a 'whore' and a 'slut' in the presence of the girl's mother serves no purpose other than to provoke a confrontation"); *In re John M.*, 201 Ariz. 424, 428, 36 P.3d 772 (App. 2001) (holding that racial slurs were "likely to provoke a violent reaction when addressed to an ordinary citizen of African-American descent"); *Svedberg* v. *Stamness*, 525 N.W.2d 678, 684 (N.D. 1994) (observing that "it is proper to consider the age of the addressee when determining the contextual setting" and that "[n]o one would argue that a different reaction is likely if a [thirteen year old] boy and a [seventy-five year old] man are confronted with identical fighting words"); see also *People in the Interest of R.C.*, supra, 2016 WL 6803065, *7 (concluding that "the average person—even an average [fourteen year old]—would not be expected to fly into a violent rage upon being shown a photo of himself with a penis drawn over it").

Similarly, because the fighting words exception is concerned with the likelihood of violent retaliation, it properly distinguishes between the average citizen and those addressees who are in a position that carries with it an expectation of exercising a greater degree of restraint. In *Lewis* v. *New Orleans*, supra, 415 U.S. 135, Justice Powell, in concurrence, suggested that "a properly trained [police] officer may reasonably be expected to exercise a higher degree of restraint than the average citizen, and thus be less likely to respond belligerently to fighting words." (Internal quotation marks omitted.) The Supreme Court later recognized the legitimacy of

this principle, observing that the fighting words exception "might require a narrower application in cases involving words addressed to a police officer" for the reason articulated by Justice Powell.[8] *Houston* v. *Hill*, 482 U.S. 451, 462, 107 S. Ct. 2502, 96 L. Ed. 2d 398 (1987). The Supreme Court did not have occasion to formally adopt the narrower standard in either *Lewis* or *Hill* because those cases turned on facial challenges, not as applied challenges that would require analyzing the speaker and the police officer addressee. Nevertheless, a majority of courts, including ours, hold police officers to a higher standard than ordinary citizens when determining the likelihood of a violent response by the addressee. See, e.g., *State* v. *Williams*, 205 Conn. 456, 474 n.7, 534 A.2d 230 (1987); *State* v. *Nelson*, 38 Conn. Supp. 349, 354, 448 A.2d 214 (1982); *Harbin* v. *State*, 358 So. 2d 856, 857 (Fla. App. 1978); *State* v. *John W.*, supra, 418 A.2d 1104.

The Supreme Court has not weighed in on the question of whether positions other than police officers could carry a greater expectation of restraint than the ordinary citizen. Indeed, since *Texas* v. *Johnson*, supra, 491 U.S. 409, the Supreme Court has not considered the fighting words exception as applied to any addressee in more than twenty-five years. Nevertheless, several courts have considered as part of the contextual inquiry whether the addressee's position would reasonably be expected to cause him or her to exercise a higher degree of restraint than the ordinary citizen under the circumstances. See, e.g., *In re Nickolas S.*, supra, 226 Ariz. 188 ("we do not believe that [the student's] insults would likely have provoked an ordinary teacher to 'exchange fisticuffs' with the student or to otherwise react violently"); *In re Louise C.*, 197 Ariz. 84, 86, 3 P.3d 1004 (App. 1999) (juvenile's derogatory language to principal did not constitute fighting words because "[it] was not likely to provoke an ordinary citizen to a violent reaction, and it was less likely to provoke such a response from a school official"); *State* v. *Tracy*, supra, 200 Vt. 238 n.19 (determining that "average person in the coach's position would [not] reasonably be expected to respond to [the] defendant's harangue with violence" where defendant was parent of player on coach's junior high school girls' basketball team); but see *People* v. *Stephen*, supra, 153 Misc. 2d 390 (distinguishing earlier fighting words case involving defendant commenting to both police officer and private security guard, latter being "a civilian from whom [the remarks] might conceivably have evoked a retaliatory response").

In sum, these cases affirm the fundamental principle that there are no per se fighting words; rather, courts must determine on a case-by-case basis all of the circumstances relevant to whether a reasonable person in the position of the actual addressee would have been likely to respond with violence. This principle is consistent with the contextual approach taken when consider-

ing other categories of speech deemed to fall outside the scope of first amendment protection, such as true threats and incitement. See, e.g., *State* v. *Krijger*, 313 Conn. 434, 450, 97 A.3d 946 (2014) ("In the context of a threat of physical violence, [w]hether a particular statement may properly be considered to be a [true] threat is governed by an objective standard—whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault. . . . [A]lleged threats should be considered in light of their entire factual context, including the surrounding events and reaction of the listeners." [Internal quotation marks omitted.]); id., 453–54 ("[a]n important factor to be considered in determining whether a facially ambiguous statement constitutes a true threat is the prior relationship between the parties"); *In re S.W.*, 45 A.3d 151, 157 (D.C. 2012) ("[A] determination of what a defendant actually said is just the beginning of a threats analysis. Even when words are threatening on their face, careful attention must be paid to the context in which those statements are made to determine if the words may be objectively perceived as threatening."); see also *Texas* v. *Johnson*, supra, 491 U.S. 409 (in considering whether public burning of American flag constituted unprotected incitement, Supreme Court observed that "we have not permitted the government to assume that every expression of a provocative idea will incite a riot, but have instead required careful consideration of the *actual circumstances* surrounding such expression, asking whether the expression is directed to inciting or producing imminent lawless action and is likely to incite or produce such action" [emphasis added; internal quotation marks omitted]).

We are mindful that, despite the substantial body of case law underscoring the significance of the actual circumstances in determining whether the words spoken fall within the narrow fighting words exception, a few courts remain reluctant to take into account the circumstances of the addressee, e.g., occupation, in considering whether he or she is more or less likely to respond with immediate violence. See, e.g., *State* v. *Robinson*, 319 Mont. 82, 87, 82 P.3d 27 (2003) (declining to apply heightened standard to police officers); *State* v. *Matthews*, 111 A.3d 390, 401 n.12 (R.I. 2015) (same). The rationale behind ignoring these characteristics of the addressee is that such a standard would be inconsistent with applying an objective standard contemplating an average addressee. This position is flawed in several respects.

First, these courts misapprehend the objective aspect of the fighting words standard. The " 'average addressee' " element "was designed to safeguard against the suppression of speech which might only provoke a particularly violent or sensitive listener"

because "[a] test which turned upon the response of the actual addressee would run the risk of impinging upon the free speech rights of the speaker who could then be silenced based upon the particular sensitivities of each individual addressee." *People* v. *Prisinzano*, supra, 170 Misc. 2d 529. Accordingly, it is not inconsistent with the application of an objective standard to consider the entire factual context in which the words were uttered because "[i]t is the tendency or likelihood of the words to provoke violent reaction that is the touchstone of the *Chaplinsky* test . . . ."[9] *Lamar* v. *Banks*, supra, 684 F.2d 718; see also S. Gard, "Fighting Words as Free Speech," 58 Wash. U. L.Q. 531, 558 (1980) ("[I]t is certainly consistent with an objective [fighting words] test to apply a more specific standard of 'the ordinary reasonable police officer' in appropriate situations. Indeed, the adoption of a standard of the ordinary reasonable professional has never been deemed inconsistent with an objective standard of liability." [Footnote omitted.]); cf. *State* v. *Krijger*, supra, 313 Conn. 450 (describing "objective" standard for analyzing true threats considering "their entire factual context, including the surrounding events and reaction of the listeners" [internal quotation marks omitted]).

Second, it is precisely this consideration of the specific context in which the words were uttered and the likelihood of *actual* violence, not an "undifferentiated fear or apprehension of disturbance," that is required by the United States Supreme Court's decisions following *Chaplinsky*. (Internal quotation marks omitted.) *Cohen* v. *California*, supra, 403 U.S. 23; see also *Gooding* v. *Wilson*, supra, 405 U.S. 528 (declaring statute facially overbroad because, as construed, it was applicable "to utterances where there was no likelihood that the person addressed would make an immediate violent response"). Because the fighting words exception is concerned only with preventing the likelihood of actual violence, an approach ignoring the circumstances of the addressee is antithetical and simply unworkable. For example, applying such an approach in this case would require us to engage in the following legal fiction: although Freeman was insulted on the basis of her gender, appearance, and apparent suitability for her position as a store manager, the fact finder would be required to assess how some hypothetical "ordinary" addressee with no apparent gender, appearance, or profession would likely respond. See F. Kobel, "The Fighting Words Doctrine—Is There a Clear and Present Danger to the Standard?," 84 Dick. L. Rev. 75, 94 (1979) (describing average addressee standard, which emphasizes words themselves, as "an attractive one because of its equitable overtones," but nevertheless "inherently faulty" because "[a]bsent from the standard is criteria by which to judge what is average").

Finally, as alluded to previously in this opinion, the fighting words exception is not concerned with creating

symmetrical free speech rights by way of establishing a uniform set of words that are constitutionally proscribed. See *Cohen* v. *California*, supra, 403 U.S. 22–23 (rejecting as "untenable" idea that "[s]tates, acting as guardians of public morality, may properly remove [an] offensive word from the public vocabulary"). Rather, because the fighting words exception is intended only to prevent the likelihood of an actual violent response, it is an unfortunate but necessary consequence that we are required to differentiate between addressees who are more or less likely to respond violently and speakers who are more or less likely to elicit such a response. See *Conkle* v. *State*, 677 So. 2d 1211, 1217 (Ala. Crim. App. 1995) ("[P]resumably, statements made to classes of victims who may not be perceived as persons who would likely respond with physical retaliation . . . may seem to require a higher level of 'low speech' to constitute 'fighting words.' However, this possible discrimination as to victims is explainable in that the purpose . . . is to ensure public safety and public order."); A. Wertheimer, note, "The First Amendment Distinction between Conduct and Content: A Conceptual Framework for Understanding Fighting Words Jurisprudence," 63 Fordham L. Rev. 793, 815–16 (1994) (applying standard of reasonable person in position of actual addressee "is consistent with the idea that words themselves are innocent until exploited in circumstances where particular addressees are likely to retaliate"); note, "The Demise of the *Chaplinsky* Fighting Words Doctrine: An Argument for Its Interment," 106 Harv. L. Rev. 1129, 1136 (1993) ("[b]ecause the [Supreme] Court is concerned with the likelihood that speech will actually produce violent consequences, it logically distinguishes between addressees who are more or less prone to respond with violence").

Accordingly, a proper contextual analysis requires consideration of the actual circumstances, as perceived by both a reasonable speaker and addressee, to determine whether there was a likelihood of violent retaliation. This necessarily includes the manner in which the words were uttered, by whom and to whom the words were uttered, and any other attendant circumstances that were objectively apparent and bear on the question of whether a violent response was likely. Indeed, one matter on which both parties agree is that our inquiry must focus on the perspective of an average store manager in Freeman's position. With this framework in place to guide a proper, contextual analysis, we turn to the issue in the present case.

In considering the defendant's challenge to the sufficiency of the evidence to support her conviction of breach of the peace in the second degree in accordance with her first amendment rights, we apply a two part test. First, as reflected in the previous recitation of facts, we construe the evidence in the light most favorable to sustaining the verdict. See *State* v. *Cook*, 287 Conn. 237,

254, 947 A.2d 307, cert. denied, 555 U.S. 970, 129 S. Ct. 464, 172 L. Ed. 2d 328 (2008). Second, we determine whether the trier of fact could have concluded from those facts and reasonable inferences drawn therefrom that the cumulative force of the evidence established guilt beyond a reasonable doubt. See id. Accordingly, to establish the defendant's violation of § 53a-181 (a) (5); see footnote 1 of this opinion; in light of its constitutional gloss, the state was required to prove beyond a reasonable doubt that the defendant's words were likely to provoke an imminent violent response from an average store manager in Freeman's position. Cf. *State* v. *Krijger*, supra, 313 Conn. 448 ("[t]o establish the defendant's violation of [General Statutes (Rev. to 2007)] §§ 53a-62 [a] [3] and 53a-181 [a] [3] on the basis of his statements to [the town attorney], the state was required to prove beyond a reasonable doubt that those statements represented a true threat").

"In cases where [the line between speech unconditionally guaranteed and speech which may be legitimately regulated] must be drawn, the rule is that we examine for ourselves the statements in issue and the circumstances under which they were made to see" if they are consistent with the first amendment. (Internal quotation marks omitted.) *State* v. *DeLoreto*, 265 Conn. 145, 153, 827 A.2d 671 (2003); see also *DiMartino* v. *Richens*, 263 Conn. 639, 661, 822 A.2d 205 (2003) ("inquiry into the protected status of . . . speech is one of law, not fact" [internal quotation marks omitted]). We undertake an independent examination of the record as a whole to ensure "that the judgment does not constitute a forbidden intrusion on the field of free expression." (Internal quotation marks omitted.) *State* v. *DeLoreto*, supra, 153.

At the outset of that examination, we must acknowledge that the words and phrases used by the defendant—"fat ugly bitch," "cunt," and "fuck you, you're not a manager"—were extremely offensive and meant to personally demean Freeman. The defendant invoked one or more of the most vulgar terms known in our lexicon to refer to Freeman's gender. Nevertheless, "[t]he question in this case is not whether the defendant's words were reprehensible, which they clearly were; or cruel, which they just as assuredly were; or whether they were calculated to cause psychic harm, which they unquestionably were; but whether they were *criminal*." (Emphasis in original.) *State* v. *Krijger*, 130 Conn. App. 470, 485, 24 A.3d 42 (2011) (*Lavine, J.*, dissenting), rev'd, 313 Conn. 434, 97 A.3d 946 (2014) (adopting Appellate Court dissent's position). Uttering a cruel or offensive word is not a crime unless it would tend to provoke a reasonable person in the addressee's position to immediately retaliate with violence under the circumstances. See *People in the Interest of R.C.*, supra, 2016 WL 6803065, *6–7 (concluding that mere utterance of " 'cocksucker,' " although vulgar and pro-

fane, did not constitute fighting words). Given the context of the defendant's remarks, we cannot conclude that the insults were "akin to dropping a match into a pool of gasoline." *State* v. *Tracy*, supra, 200 Vt. 237.

Several factors bear on our conclusion that the state did not prove beyond a reasonable doubt that Freeman was likely to retaliate with violence. We begin with the fact that the confrontation in the supermarket did not happen in a vacuum; it was preceded by a telephone call in which the defendant was belligerent and used many of the "swear word[s]" that she would later say to Freeman in person. After the defendant arrived at the supermarket a few minutes later, Freeman correctly surmised that she was the woman who had just called. Consequently, when Freeman approached the defendant to reiterate a message that she knew the defendant did not want to hear, Freeman reasonably would have been aware of the possibility that a similar barrage of insults, however unwarranted, would be directed at her. Freeman's position of authority at the supermarket, however, placed her in a role in which she had to approach the defendant.

In addition, as the store manager on duty, Freeman was charged with handling customer service matters. The defendant's angry words were an obvious expression of frustration at not being able to obtain services to which she thought she was entitled. Store managers are routinely confronted by disappointed, frustrated customers who express themselves in angry terms, although not always as crude as those used by the defendant. People in authoritative positions of management and control are expected to diffuse hostile situations, if not for the sake of the store's relationship with that particular customer, then for the sake of other customers milling about the store. Indeed, as the manager in charge of a large supermarket, Freeman would be expected to model appropriate, responsive behavior, aimed at de-escalating the situation, for her subordinates, at least one of whom was observing the exchange.

Significantly, as a store manager, Freeman would have had a degree of control over the premises where the confrontation took place. An average store manager would know as she approached the defendant that, if the defendant became abusive, the manager could demand that the defendant leave the premises, threaten to have her arrested for trespassing if she failed to comply, and make good on that threat if the defendant still refused to leave. With such lawful self-help tools at her disposal and the expectations attendant to her position, it does not appear reasonably likely that Freeman was at risk of losing control over the confrontation.

We recognize that a different conclusion might be warranted if the defendant directed the same words at Freeman after Freeman ended her work day and left the supermarket, depending on the circumstances pre-

sented. Given the totality of the circumstances in the present case, however, it would be unlikely for an on duty store manager in Freeman's position to respond in kind to the defendant's angry diatribe with similar expletives. It would be considerably more unlikely for a person in Freeman's position, in the circumstances presented, to respond with a physical act of violence. Indeed, in keeping with the expectations attendant to her position and the circumstances with which she was confronted, Freeman did not respond with profanity, much less with violence, toward the defendant. Instead, she terminated the conversation before it could escalate further with the simple words, "Have a good night." Although the reaction of the addressee is not dispositive; see *Lamar* v. *Banks*, supra, 684 F.2d 718–19; it is probative of the likelihood of a violent reaction. See *Klen* v. *Loveland*, supra, 661 F.3d 510 ("[t]he reaction of actual hearers of the words constitutes significant probative evidence concerning whether the speech was inherently likely to cause a violent reaction"); *Seattle* v. *Camby*, supra, 104 Wn. 2d 54 ("the addressee's reaction or failure to react is not the sole criteria, but is a factor to be considered in evaluating the actual situation in which the words were spoken"). There is no reason to believe that Freeman's reaction was uncharacteristic of a reasonable professional in a like situation. Therefore, on the basis of our independent review of the record, we cannot conclude that an average store manager in Freeman's position would have responded to the defendant's remarks with imminent violence.

Nonetheless, the state contends that "courts in sister states and in Connecticut have found comparable abusive epithets to constitute 'fighting words' where they have been directed at police officers who, because they are 'properly trained,' 'may reasonably be expected to exercise a higher degree of restraint than the average citizen,' " quoting this court's decision in *State* v. *Szymkiewicz*, supra, 237 Conn. 620 n.12, as one such example. We disagree that this case law is sufficiently relevant or persuasive. We observe that all of the cases cited were decided two or three decades ago, and therefore do not consider case law recognizing that public sensitivities have been dulled to some extent by the devolution of discourse.[10] With regard to *Szymkiewicz*, a case not involving words directed at a police officer, although there are superficial factual similarities to the present case in that the expletive fuck you was directed at an employee of a Stop & Shop supermarket; id., 615; that is where the similarities end. Significantly, the majority in *Szymkiewicz* pointed to a "heated exchange" that had ensued between the store detective and the defendant after the former accused the latter of shoplifting and to a threatening remark directed to the store detective as part of the "cumulative" evidence supporting the application of the fighting words exception. Id., 623. Thus, the majority's conclusion in that

case is consistent with others that considered whether the words at issue were preceded by a hostile exchange or accompanied by aggressive behavior when determining the likelihood of a violent reaction. See *State* v. *James M.*, supra, 111 N.M. 476; *Landrum* v. *Sarratt*, supra, 352 S.C. 143; *In re S.J.N-K.*, supra, 647 N.W.2d 709. Indeed, precisely for these reasons, the defendant in *Szymkiewicz* was convicted under a different subdivision of the breach of the peace statute than the one at issue in the present case; see *State* v. *Szymkiewicz*, supra, 614; requiring the defendant to have engaged "in fighting or in violent, tumultuous or threatening behavior . . . ." General Statutes § 53a-181 (a) (1).

Insofar as there is dictum in a footnote in *Szymkiewicz* suggesting that, in order for the heightened expectation of restraint applicable to police officers to apply to another type of addressee, the addressee must have received the same level of training as that of a police officer; see *State* v. *Szymkiewicz*, supra, 237 Conn. 620 n.12; we need not consider the propriety of that conclusion. We do not rest our decision on the nature of the training received by the average supermarket manager; rather, we focus on the expectations attendant to such positions under the particular circumstances of the present case. We observe that the court in *Szymkiewicz* recognized that it did not have the benefit of briefing on this issue, as the defendant had made no such claim. See id. We further observe that the court in *Szymkiewicz* relied on the actual training afforded to the particular store detective, a focus that appears to be in tension with the established objective standard of the average listener in the addressee's position. Cf. *In re Nickolas S.*, supra, 226 Ariz. 188 (considering how ordinary teacher would respond to insults from student in classroom setting). Accordingly, *Szymkiewicz* does not dictate a contrary conclusion.

In sum, the natural reaction of an average person in Freeman's position who is confronted with a customer's profane outburst, unaccompanied by any threats, would not be to strike her. We do not intend to suggest that words directed at a store manager will never constitute fighting words. Rather, we simply hold that under these circumstances the defendant's vulgar insults would not be likely to provoke violent retaliation. Because the defendant's speech does not fall within the narrow category of unprotected fighting words, her conviction of breach of the peace in the second degree on the basis of pure speech constitutes a violation of the first amendment to the United States constitution.

The judgment is reversed and the case is remanded with direction to render a judgment of acquittal.

In this opinion PALMER, ROBINSON and D'AURIA, Js., concurred.

* This case was originally argued before a panel of this court consisting of Chief Justice Rogers and Justices Palmer, Eveleigh, McDonald, Espinosa

and Robinson. Thereafter, Justice D'Auria was added to the panel and has read the briefs and appendices, and listened to a recording of the oral argument prior to participating in this decision.

[1] General Statutes § 53a-181 (a) provides in relevant part: "A person is guilty of breach of the peace in the second degree when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating the risk thereof, such person . . . (5) in a public place, uses abusive . . . language . . . ." The defendant does not contest the sufficiency of the evidence to support her conviction under the statutory language, but only the sufficiency of the evidence to establish that her speech constituted constitutionally unprotected fighting words. Accordingly, we need not consider the statutory language in connection with our review of the evidence.

[2] Because we conclude there is insufficient evidence to sustain the defendant's conviction for breach of the peace in the second degree, we need not reach her claim that the jury was improperly instructed on that charge.

[3] In her testimony, Freeman spelled out this word.

[4] The state also charged the defendant with two counts of threatening in the second degree in violation of General Statutes § 53a-62 (a) (2) and (3) for conduct that it alleged had occurred after the incident giving rise to the present appeal. Specifically, the state alleged that after she left the supermarket, the defendant telephoned a second time, told the employee answering the telephone to "come outside," and "that there was a gun waiting for [her]." The jury found the defendant not guilty of one of the threatening counts and was unable to reach a verdict on the other count. The court declared a mistrial on the latter.

[5] Although this court recently has explained that it is appropriate to consider a state constitutional claim first "when the issue presented is one of first impression under both the state and federal constitutions"; *State* v. *Kono*, 324 Conn. 80, 82 n.3, 152 A.3d 1 (2016); the issue in the present case is not one of first impression under the federal constitution. Moreover, because the established federal standard is clearly dispositive, to resolve the case on this basis is in accord with jurisprudence under which "we eschew unnecessarily deciding constitutional questions . . . ." (Citations omitted.) *Hogan* v. *Dept. of Children & Families*, 290 Conn. 545, 560, 964 A.2d 1213 (2009). Finally, we note that the briefs of both parties examine federal jurisprudence on this question. We therefore leave for another day the question of whether the state constitution is more protective of speech than the federal constitution with regard to fighting words.

[6] G. Carlin, Class Clown (Little David Records 1972). We note that two of those seven words were uttered by the defendant in the present case.

[7] The defendant did not adduce evidence at trial to establish the extent to which her physical impairment was objectively apparent to Freeman, other than the fact that she carried a cane. In light of special legal protections and societal conventions dictating that violent behavior is more reprehensible when committed against a physically disabled person than against a person without a physical impairment; see, e.g., General Statutes § 53a-59a (a) (1) (creating separate offense for assault in first degree against physically disabled person); a question arises whether the possibility that an average person in Freeman's position would strike a person with such impairments for leveling verbal insults is even more remote than if the person did not have such a disability. Given our conclusion that a person in Freeman's position would not be likely to respond with violence to an ordinary customer under the circumstances, however, we need not express an opinion on this question.

[8] In *Lewis*, Justice Powell in his concurrence also observed that the Louisiana statute under which the defendant had been convicted "confer[red] on police a virtually unrestrained power to arrest and charge persons with a violation" because for the majority of arrests, which occur in one-on-one situations, "[a]ll that is required for conviction is that the court accept the testimony of the officer that obscene or opprobrious language had been used toward him while in performance of his duties." *Lewis* v. *New Orleans*, supra, 415 U.S. 135. "The opportunity for abuse" was thus "self-evident." Id., 136 (Powell, J., concurring).

Thereafter, the Supreme Court relied on this language in concluding that a Houston, Texas ordinance prohibiting speech that "in any manner . . . interrupt[s]" a police officer was substantially overbroad. (Internal quotation marks omitted.) *Houston* v. *Hill*, 482 U.S. 451, 463–65, 467, 107 S. Ct. 2502, 96 L. Ed. 2d 398 (1987). The court also noted that "[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation

from a police state"; id., 462–63; but that such freedom could be restricted when the speech constitutes fighting words. See id., 464 n.12.

[9] Consideration of only those objectively discernible traits of the speaker and the addressee "is consistent with the degree of subjectivity that the [Supreme] Court has used in its police officer cases, in order to avoid some of the pitfalls of requiring the speaker or fact-finder to 'calculat[e] . . . the boiling point of a particular person' in each case. *Ashton* v. *Kentucky*, 384 U.S. 195, 200 [86 S. Ct. 1407, 16 L. Ed. 2d 469] (1966). By specifying only limited and obvious traits, such as the fact that the addressee is a police officer—and the same could be said of the fact that the addressee is a woman or a disabled elderly man—the [c]ourt refines its test of the likelihood that violence will ensue without requiring difficult litigation of the state of mind of both the speaker and addressee." Note, "The Demise of the *Chaplinsky* Fighting Words Doctrine: An Argument for Its Interment," 106 Harv. L. Rev. 1129, 1136–37 n.58 (1993).

[10] The state cites cases from other jurisdictions in which convictions were sustained when the defendant had shouted "fuck you" to a police officer or called an officer a "fuckhead" or "motherfucker." Those cases are either distinguishable on the facts and procedural posture; see, e.g., *State* v. *Wood*, 112 Ohio App. 3d 621, 628–29, 679 N.E.2d 735 (1996) (state was not required to establish fighting words beyond reasonable doubt because defendant pleaded no contest; prosecutor recited on record that defendant continued using loud and abusive language for several minutes despite several requests to stop); or because the courts did not apply a heightened standard despite the fact that the words were directed at police officers. See, e.g., *C.J.R.* v. *State*, 429 So. 2d 753, 754 (Fla. App.), cert. denied, 440 So. 2d 351 (Fla. 1983); *State* v. *Groves*, 219 Neb. 382, 386, 363 N.W.2d 507 (1985).