STATE OF CONNECTICUT *v.* JOHN HOSKINS

APPELLATE SESSION OF THE SUPERIOR COURT

FILE No. 581

588

Argued February 22—decided May 5, 1978

*Donald R. Holtman,* for the appellant (defendant).

*Thomas P. Miano,* assistant prosecuting attorney, for the appellee (state).

PARSKEY, J. The defendant was convicted of the crimes of breach of the peace, criminal mischief in the third degree and wilful failure to appear in the second degree. The first two charges arose out of certain slogans or messages which the defendant had painted on his church building. The third charge arose out of the defendant's failure to appear in court when his case was assigned for trial. The defendant has appealed from his conviction on all

counts, claiming that his conviction on the breach of peace charge is precluded by the free speech provisions of the state and federal constitutions and that there was insufficient evidence to sustain his conviction on the other two charges.

The defendant is a minister of the Church in Christ Jesus. The church owns property on Main Street in the north end of the city of Hartford. On October 22, 1976, upon the receipt of a complaint, the police observed the defendant painting religious slogans on the plywood boards attached to the building. The slogans, which were painted in red paint in letters approximately twelve inches high, read "Jews murdered Jesus Christ, God raised him from the dead, repent of your sins and be baptized into the name of Jesus Christ and be saved." The slogans were clearly visible from the street. Similar slogans had been observed as early as September, 1976. Some members of the Jewish community who viewed the signs found them offensive. Others threatened violence but were dissuaded by leaders of the Jewish community who observed that, since the defendant had been arrested, the matter should be left for judicial determination. The defendant testified that he was aware that the message was offensive to the Jewish community and would produce a violent reaction in that community because that was the historical reaction, but that he felt that he was duty bound to convey the message because it was contained in the gospel.

## I

### BREACH OF THE PEACE

In its bill of particulars the state charged the defendant with violation of that portion of General Statutes § 53a-181 which concerns posting "any

offensive, indecent or abusive matter concerning any person."[1] The word "person" as used in this statute includes the plural as well as the singular. General Statutes § 1-1 (f). The defendant's assertion that the statute cannot constitutionally cover offensive utterances against groups is not well taken. *Hess* v. *Indiana,* 414 U.S. 105, 107.

Next, the defendant contends that the statute does not pass constitutional muster because it is both vague and overbroad. For a statute to pass the vagueness test in the free speech arena, no person of common intelligence should be required to speculate as to its meaning; all are entitled to know what the statute commands or forbids. *Hynes* v. *Mayor and Council of Borough of Oradell,* 425 U.S. 610, 620. If this test is applied, the words "offensive, indecent and abusive" are so well known that one need not guess as to their meaning. The statute is, after all, a breach of the peace law. As such it is not at all concerned with expressions which might affront the thin-skinned, distress the squeamish or cow the timid. The expressions covered by the statute are those which touch the raw nerves of one's sense of dignity, decency and personality and which, therefore, tend to trigger an immediate violent reaction.

In respect to overbreadth the central question is whether included in the statutory sweep are both protected and unprotected speech. *Gooding* v. *Wilson,* 405 U.S. 518, 522. The statute in question covers expressions which are calculated or likely to provoke another person or persons to acts of immediate

---

[1] General Statutes § 53a-181 provides in pertinent part: "(a) A person is guilty of breach of the peace when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he: . . . (4) publicly exhibits, distributes, posts up or advertises any offensive, indecent or abusive matter concerning any person . . . ."

violence. See *State* v. *Cantwell,* 126 Conn. 1, 7. Such expressions are not constitutionally protected. *Chaplinsky* v. *New Hampshire,* 315 U.S. 568, 572.

The defendant argues that the words "offensive," "indecent" and "abusive" are too elastic and imprecise to meet constitutional standards and cites *Gooding* v. *Wilson,* supra, *Plummer* v. *City of Columbus,* 414 U.S. 2, and *Lewis* v. *City of New Orleans,* 415 U.S. 130, to support his argument. The defendant's contention has merit only if one looks at the dictionary definitions. The problem which the court faced in *Gooding, Plummer* and *Lewis* was not with the words themselves but rather with the failure of the Georgia, Ohio and Louisiana courts to limit the language to "fighting words." No such problem exists here.

*Chaplinsky* v. *New Hampshire,* supra, put beyond the pale of constitutional protection "fighting words," that is, "those which by their very utterance . . . tend to incite an immediate breach of the peace." *Chaplinsky* v. *New Hampshire,* supra, 572. The "fighting words" concept has two aspects. One involves the quality of the words themselves. The other concerns the circumstances under which the words are used. Expressions which stir people to anger, invite public dispute, bring about a condition of unrest; *Terminiello* v. *Chicago,* 337 U.S. 1, 4; or create an undifferentiated fear or apprehension of disturbance; *Tinker* v. *Des Moines Independent Community School District,* 393 U.S. 503, 508; do not qualify. To qualify as "fighting words" the expression must be inherently inflammatory. *Street* v. *New York,* 394 U.S. 576, 592. In respect to the second aspect, words however inflammatory are not punishable unless they are directed at a particular individual or a defined group. *Cohen* v. *California,* 403 U.S. 15, 20; *Beauharnais* v. *Illinois,* 343 U.S. 250, 258.

Under the most stringent test, calling Jews Christ-killers is inherently inflammatory. "These terse epithets come down to our generation weighted with hatreds accumulated through centuries of bloodshed. They are recognized words of art in the profession of defamation. They are not the kind of insult that men bandy and laugh off when the spirits are high and the flagons are low. They are not in that class of epithets whose literal sting will be drawn if the speaker smiles when he uses them. They are always, and in every context, insults which do not spring from reason and can be answered by none. Their historical associations with violence are well understood, both by those who hurl and those who are struck by these missiles. . . . Of course, people might pass this speaker by as a mental case, and so they might file out of a theatre in good order at the cry of 'fire.' But in both cases there is genuine likelihood that someone will get hurt." *Kunz* v. *New York,* 340 U.S. 290, 299 (Jackson, J., dissenting).

The United States Supreme Court has not had occasion to consider whether private property, when utilized metaphorically as a launching pad for hurling inflammatory invective into the public atmosphere, is a privileged sanctuary under the first and fourteenth amendments. If a person can be prevented from disturbing his neighbor's tranquility by noise emissions from his private property; *O'Neill* v. *Carolina Freight Carriers Corporation,* 156 Conn. 613, 617; *Nair* v. *Thaw,* 156 Conn. 445, 451; we see no reason why he cannot be punished for disturbing the public peace by use of his private property for the flagrant dissemination of noxious inflammatory speech. See *Beauharnais* v. *Illinois,* supra.

The United States Supreme Court has pitted the first amendment against the privacy rights of those who may be unwilling viewers or auditors in a

variety of situations: *Erznoznik* v. *City of Jacksonville,* 422 U.S. 205 (nudity films in a drive-in theatre); *Lehman* v. *City of Shaker Heights,* 418 U.S. 298 (political advertising on a bus); *Breard* v. *Alexandria,* 341 U.S. 622 (door-to-door solicitation); and *Kovacs* v. *Cooper,* 336 U.S. 77 (sound trucks). In those situations, such as *Kovacs, Breard* and *Lehman,* where the speaker insisted on imposing his views on a captive audience government intervention was approved; whereas in those situations such as *Erznoznik* where the viewing was accidental and could easily be averted the first amendment prevailed.

In the area of "fighting words" the demarcation line has been drawn between the specifically targeted and the diffuse expressions. Calling a marshall a "damned fascist" and a "damned racketeer"; *Chaplinsky* v. *New Hampshire,* 315 U.S. 568; and distributing leaflets vilifying blacks; *Beauharnais* v. *Illinois,* 343 U.S. 250; were held not entitled to constitutional protection. On the other hand, the expressions "Fuck the draft" on a jacket; *Cohen* v. *California,* 403 U.S. 15; and "We'll take the fucking street later (or again)"; *Hess* v. *Indiana,* 414 U.S. 105; were held not to constitute "fighting words" in the circumstances of their use. In addition, otherwise inflammatory words are constitutionally protected if they are addressed to a willing, though unsuspecting, listener. *Cantwell* v. *Connecticut,* 310 U.S. 296 (recorded anti-Catholic diatribe). Although in *Cohen* v. *California,* supra, the court observed that an inadvertent observer could avert his eyes, there is no United States Supreme Court case which holds that inflammatory words specifically directed to a person or group are privileged because the object of such remarks can always avert his eyes or block his ears.

Applying these principles, although it is a close question, we cannot hold that under the circumstances of this case the evidence would support a conclusion that the expression used was intended or likely to produce imminent disorder. Therefore the breach of the peace conviction cannot stand. *Hess* v. *Indiana,* supra, 109. Although there was evidence that some members of the Jewish community were offended and others threatened violence, the imminence of such reaction is not apparent in the record. Obviously, so long as the message remains posted, it will be a constant reminder both to the Jewish community and the community at large. What effect this will have remains to be seen and may in some measure depend on the proximity of the Jewish community to the message. For example, if Cantwell, on a street inhabited predominantly by Catholics, walked or drove up and down with placards carrying the vitriolic anti-Catholic messages contained in his phonograph record, in our opinion *Cantwell* v. *Connecticut,* supra, would have been decided differently.

There are those who would limit *Chaplinsky* v. *New Hampshire,* supra, to interaction between individuals. Emerson, The System of Freedom of Expression, 338. We disagree. Emerson acknowledges that the use of "fighting words" is equivalent to knocking a chip off the shoulder and therefore is the beginning of action. Words are like sparks. They are capable not only of igniting individual reaction, they are equally capable of setting off a group conflagration whether by way of inciting to riot or provoking hostile reaction. To suggest that the state may put out the grass fire but is constitutionally powerless to deal with the fire storm is fanciful.

## II

### CRIMINAL MISCHIEF

The essential elements of the crime of criminal mischief in the third degree[2] are (1) that tangible property of another was damaged, (2) that the defendant intentionally or recklessly caused the damage and (3) that the defendant has no reasonable ground to believe that he had a right to do so. The property involved in this charge consisted of plywood boards attached to the church building by the city of Hartford at the defendant's request.

It is self-evident that painting slogans or messages on another's property damages that property at least to the extent of the cost of removing the slogan or message. Furthermore, it is undisputed that the painting was intentional. What is not clear is the ownership of the plywood boards on which the painting was done. Although the boards, according to the defendant's testimony, were owned by the city of Hartford originally, once they were attached to the church building, in the absence of evidence to the contrary, they became a part of the realty. *Lesser* v. *Bridgeport-City Trust Co.,* 124 Conn. 59, 64. The significance of this result is twofold. First, if the plywood board was church property, then the city's consent was not needed before it could be painted. Second, and more importantly, as church property, the fact that for a period of almost two months before the defendant's arrest the message appeared on the building without protest by the defendant's congregants would not rule out the reasonable hypothesis that the defendant as the minister of the church painted the message with the

[2] General Statutes § 53a-117 provides in pertinent part: "(a) A person is guilty of criminal mischief in the third degree when, having no reasonable ground to believe he has a right to do so, he: (1) Intentionally or recklessly (A) damages tangible property of another . . . ."

church's acquiescence, if not its blessing. That being so, the court could not find beyond a reasonable doubt that when he painted the message the defendant had no reasonable ground to believe that he had a right to do so.

## III

### WILFUL FAILURE TO APPEAR

The defendant was arrested on October 22, 1976, for the crimes of breach of the peace and criminal mischief in the third degree, both of which crimes are misdemeanors, and was released on his written promise to appear. He appeared on October 29, 1976, and entered pleas of not guilty. Thereafter, his attorney, Patricia Lilly, filed several motions in the case. The case was assigned for trial on March 3, 1977. Attorney Lilly appeared but the defendant failed to appear. The defendant testified that from January until his rearrest in July, 1977, he was out of the country and that during that entire time he did not inform his attorney of his whereabouts.

To secure a conviction for wilful failure to appear in the second degree[3] the state must establish beyond a reasonable doubt that the defendant was legally called under the terms of his promise to appear, that he failed to appear and that such failure was wilful. The word "wilfully" as used in this statute implies the doing of the forbidden act purposely in violation of the law. *Rogers* v. *Doody,* 119 Conn. 532, 534; *State* v. *Nussenholtz,* 76 Conn. 92, 97; *State* v. *Foote,* 71 Conn. 737, 742. To establish wilfulness the state must prove either that the defendant received

---

[3] General Statutes § 53a-173 provides in pertinent part: "(a) Any person who, while charged with the commission of a misdemeanor and while out on bail or released under other procedure of law, wilfully fails to appear when legally called according to the terms of his bail bond or promise to appear, is guilty of failure to appear in the second degree."

and deliberately ignored a notice to appear or that he purposefully engaged in a course of conduct designed to prevent him from receiving such notice. *United States* v. *Cohen,* 450 F.2d 1019, 1021 (5th Cir.).

For the purpose of our consideration of this offense we take judicial notice of the file in the court below. *Krawiec* v. *Kraft,* 163 Conn. 445, 451. Upon examination of the promise to appear included therein, we note that on October 22, 1976, the defendant, under oath, signed a promise to appear in the Court of Common Pleas at 155 Morgan Street, Hartford, Connecticut, on October 29, 1976, and also to appear on any other date to which his case might be continued, and that if he failed so to appear he was committing an additional crime which would subject him to certain specified penalties depending on whether he was charged with a misdemeanor or a felony.

From the appearance of the defendant's attorney on the date the case was assigned for trial and the defendant's failure to appear on the trial date coupled with his departure for parts unknown, it was reasonable for the court to conclude that the defendant was guilty of a wilful failure to appear in violation of the statute. A person released on bond or promise to appear is not free to become evanescent with impunity.

There is no error as to the third count; there is error as to the first and second counts, the judgment on each of those counts is set aside and the case is remanded with direction to render a judgment of not guilty on the breach of the peace and the criminal mischief counts.

In this opinion A. ARMENTANO and SPONZO, Js., concurred.