******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* KERLYN M. TAVERAS
## (AC 38602)

Sheldon, Elgo and Eveleigh, Js.

*Syllabus*

The defendant, who previously had been convicted on guilty pleas of assault and threatening charges, appealed to this court from the judgments of the trial court revoking his probation and sentencing him to eighteen months incarceration. The defendant had been charged in three informations with violation of probation following his arrest on a charge of breach of the peace in the second degree in violation of statute (§ 53a-181 [a]), which involved an incident in which he engaged in a verbal confrontation with staff members at a preschool after he arrived late to pick up his child. After C, the assistant education manager, said something to the defendant as he walked through the building's inner set of doors to leave the preschool, the defendant responded and stated, "you better watch yourself, you better be careful," and attempted to reenter the building through the locked doors. The defendant's probation officer thereafter applied for a violation of probation warrant and, in an accompanying affidavit, averred that the defendant had said, "you better watch your back." The trial court found, by a preponderance of the evidence, that the defendant violated his probation by committing breach of the peace in the second degree. On appeal, the defendant claimed that the evidence was insufficient to establish that he violated his probation because the words he used to express his frustration with the staff members did not constitute fighting words or a true threat, which are two forms of speech that are not protected by the first amendment to the United States constitution. *Held*:

1. The state could not prevail on its claim that there was sufficient evidence to find that the defendant committed breach of the peace in the second degree on the basis of his nonverbal conduct, which was based on the assertion that the trial court reasonably could have inferred that the alleged threat was a component of the defendant's nonverbal conduct when he attempted to open the door to reenter the preschool after having made the remarks at issue; the trial court stated that its judgments were based on the defendant's threatening nature and demeanor without referencing any specific conduct, the testimony demonstrated that the defendant's conduct, either verbal or nonverbal, was not threatening until he exited the preschool, made the statement at issue and attempted to reenter the school, the record did not indicate the tone in which the statement was communicated or that the defendant made any threatening gestures in conjunction with the statement, and there was no evidence in the record describing how the defendant attempted to open the door, nor did the trial court make an inference that the defendant attempted to reenter the school in an aggressive manner.

2. The evidence adduced at the defendant's probation revocation hearing was insufficient to establish that the defendant's statement constituted either fighting words or a true threat, and because the defendant's speech did not fall within those two categories of unprotected speech, the revocation of his probation on the basis of his speech violated the first amendment:

   a. The defendant's statement that "you better be careful, you better watch yourself," did not constitute fighting words within the meaning of § 53a-181 (a) (1) or (3), as it did not have the tendency to provoke imminent retaliation from an average person in C's position; the defendant's conduct had been nonthreatening until he made the statement at issue that was ambiguous, conditional and contained no reference to an unlawful or violent act, which further reduced the probability that an average person would have responded to it with imminent violence, and the defendant was incapable of immediately following through with his statement, as he had exited the preschool's inner set of doors and was unable to reenter the preschool at the time that he made the statement.

   b. The defendant's statement did not constitute a true threat within the meaning of § 53a-181 (a) (3); a reasonable listener would not have been

highly likely to interpret the defendant's statement as a serious expression of intent to harm or assault C, as neither "you better watch yourself, you better be careful," or, "you better watch your back," communicated an explicit threat or conveyed his intent to harm or assault C, the defendant's statement and attempt to reenter the preschool was susceptible of being interpreted as either innocent or threatening conditional future conduct, and there was no evidence that C had witnessed prior, similar conduct by the defendant at the preschool or had knowledge of his prior convictions.

Argued January 16—officially released July 17, 2018

*Procedural History*

Three substitute informations charging the defendant with violation of probation, brought to the Superior Court in the judicial district of Danbury, geographical area number three, where the cases were consolidated and tried to the court, *Russo, J.*; judgments revoking the defendant's probation, from which the defendant appealed to this court; thereafter, the court, *Russo, J.*, issued an articulation of its decision. *Reversed; judgments directed.*

*James B. Streeto*, senior assistant public defender, for the appellant (defendant).

*Bruce R. Lockwood*, senior assistant state's attorney, with whom, on the brief, were *Stephen J. Sedensky III*, state's attorney, and *Sharmese L. Hodge*, assistant state's attorney, for the appellee (state).

*Opinion*

EVELEIGH, J. The defendant, Kerlyn M. Taveras, appeals from the judgments of the trial court finding him in violation of his probation and revoking his probation pursuant to General Statutes § 53a-32, following his arrest on a charge of breach of the peace in the second degree in violation of General Statutes § 53a-181 (a) (1).[1] On appeal, the defendant claims that the state adduced insufficient evidence at his probation revocation hearing to establish a violation of probation.[2] Central to the defendant's claim of insufficient evidence is whether the words he used spontaneously to express his frustration with his child's preschool staff, which formed the basis for his violation of probation, constituted "fighting words" or a "true threat," two forms of speech that are not protected by the first and fourteenth amendments to the United States constitution.[3] Under the facts and circumstances of the present case, we conclude that the defendant's speech did not constitute "fighting words" or a "true threat" and, for that reason, cannot be proscribed by § 53a-181 (a) consistent with the first amendment. We therefore agree with the defendant that the evidence adduced at his probation revocation hearing was insufficient to establish a violation of probation and, accordingly, reverse the judgments of the trial court and remand the cases with direction to render judgments in favor of the defendant.[4]

The following evidence, as adduced at the defendant's probation revocation hearing, is relevant to our resolution of this appeal. In May, 2012, in connection with three separate criminal matters, the defendant pleaded guilty to two counts of threatening in the second degree in violation of General Statutes § 53a-62 and one count of assault in the third degree in violation of General Statutes § 53a-61 (a) (1). After accepting the defendant's pleas, on August 22, 2012, the trial court sentenced the defendant to a total effective term of one year of incarceration, execution suspended after four months, followed by three years of probation. Following his sentencing, the defendant agreed to the standard conditions of probation, including the condition that he "not violate any criminal law of the United States, this state or any other state or territory." The defendant's term of probation began on July 1, 2013.

On the afternoon of March 11, 2014, the defendant was late for his child's scheduled pickup time at the Head Start Program (Head Start), a preschool in Danbury. Head Start staff telephoned the defendant, who was en route, to ascertain where he was and whether he would be picking up his child.[5] The defendant arrived approximately forty minutes late and was reminded by staff that he needed to pick his child up on time. The defendant appeared "a little irritated and [un]happy" with staff as he walked to his child's classroom. As the defendant was exiting the building with his child, he

argued with staff in the lobby in front of other children and their parents, and was asked to leave. After the defendant walked through the building's inner set of doors,[6] Sondra Cherney, Head Start's assistant education manager, "said something back to him . . . ." In response, the defendant said to Cherney, "you better watch yourself, you better be careful," attempted to reenter the building, which was locked, and then left.

Thereafter, Cherney called Monica Bevilaqua, Head Start's director, and reported the incident. Bevilaqua was not present when the incident occurred, but after having an opportunity to hear from her staff, she called the Danbury Police Department. Danbury police officers responded to the preschool and took statements from Bevilaqua,[7] Cherney, and other staff members. The next morning, the defendant appeared voluntarily at the Danbury Police Department, where he was arrested and charged with breach of the peace in the second degree.

Christopher Kelly, the defendant's probation officer, was aware of the March 11, 2014 incident and the defendant's subsequent arrest, but chose not to charge him with violation of probation on that basis at that time. Thereafter, on April 16, 2014, in an unrelated incident, the defendant was arrested and charged with violation of a protective order. The next day, Kelly applied for a violation of probation warrant on the basis of both the March 11, 2014 incident and the April 16, 2014 arrest. On May 6, 2014, the defendant was arrested and charged in three separate informations, brought pursuant to § 53a-32,[8] with violating the condition of his probation that he "not violate any criminal law . . . ."[9]

The trial court held a hearing on July 15 and July 16, 2015. The state's theory of the case was that on March 11, 2014, the defendant committed a breach of the peace in the second degree in violation of § 53a-181 (a) (1) on the basis of his "threatening and violent behavior" with staff, which "place[d] them in fear and panic."[10] See footnote 1 of this opinion. The state, however, did not offer the testimony of Cherney or any other staff member who witnessed the incident. Furthermore, the state did not attempt to introduce any witness statements taken by Danbury police officers. Instead, the state relied solely on the testimony of Kelly and Bevilaqua. Kelly testified regarding the dates and conditions of the defendant's probation. Kelly further testified that he reviewed the police report regarding the March 11, 2014 incident, but that he did not initially charge the defendant with violating his probation on the basis of that incident because the resulting charge was a misdemeanor and he had "had a discussion with [his] supervisor to give [the defendant] a second chance." At the conclusion of Kelly's testimony, the violation of probation warrant that he drafted was admitted as a full exhibit.[11]

Over the hearsay objections of defense counsel, Bevilaqua testified regarding Cherney's summary of the March 11, 2014 incident. Specifically, the state elicited the following testimony:

"[The Prosecutor]: What . . . was the nature of the [March 11, 2014] incident reported to you on that telephone call [with Cherney]? . . .

"[The Witness]: . . . That [the defendant's child] had not been picked up on time. That [staff] called [the defendant]. [The defendant] was coming down. He was not happy. When he had gotten to the school, he entered the doorway, already escalated. . . . [H]e walked down to the classroom to get [his child]. When he came back down the hallway and got to the doors he had words with staff members.

"[The Prosecutor]: Threatening words? . . .

"[The Witness]: At that point they were not.

"[The Prosecutor]: Okay.

"[The Witness]: But they continued. . . .

"[The Witness]: So, he got out the front door, door shut behind him, and [Cherney] had said something back to him, and he turned and said, you better watch yourself, you better be careful, tried to get back in the door and couldn't, and then he left."

In addition, Bevilaqua testified that there had been prior incidents at the preschool involving late pickups of the defendant's child and that her staff was familiar with the defendant. Bevilaqua further testified that this was not the first "escalated interaction" with the defendant and that she had previously witnessed the defendant behave in a threatening manner. Although the state attempted to elicit testimony detailing these prior interactions, it later abandoned that line of questioning upon objection by defense counsel.

In an oral ruling, the trial court found that the state established, by a preponderance of the evidence, that the defendant had violated his probation by committing the crime of breach of the peace in the second degree on the basis of his "threatening nature and . . . demeanor" at the preschool. As a result of this violation, the court revoked the defendant's probation and sentenced him to a total effective term of eighteen months incarceration. This appeal followed. Additional facts will be set forth as necessary.

On appeal, the defendant claims that the evidence presented at his probation revocation hearing was insufficient to support the trial court's finding that he violated his probation by committing the crime of breach of the peace in the second degree. In support of his claim, the defendant primarily argues that the evidence was insufficient to support a finding that his conduct, which consisted solely of speech, constituted fighting

words or a true threat and, therefore, cannot be proscribed by statute consistent with the first amendment. In response, the state contends that the defendant's first amendment claim is "unfounded" and, furthermore, that it presented sufficient evidence to support the trial court's finding. We agree with the defendant.

We begin by setting forth our standard of review and the legal principles applicable to probation revocation hearings. "[R]evocation of probation hearings, pursuant to § 53a-32, are comprised of two distinct phases, each with a distinct purpose. . . . In the evidentiary phase, [a] factual determination by a trial court as to whether a probationer has violated a condition of probation must first be made. . . . In the dispositional phase, [i]f a violation is found, a court must next determine whether probation should be revoked because the beneficial aspects of probation are no longer being served. . . .

"Because the present case concerns the evidentiary phase and the trial court's factual finding that the defendant violated his probation, we are guided by the standard of review applicable to that phase. The law governing the standard of proof for a violation of probation is well settled. . . . [A]ll that is required in a probation violation proceeding is enough to satisfy the court within its sound judicial discretion that the probationer has not met the terms of his probation. . . . It is also well settled that a trial court may not find a violation of probation unless it finds that the predicate facts underlying the violation have been established by a preponderance of the evidence at the hearing—that is, the evidence must induce a reasonable belief that it is more probable than not that the defendant has violated a condition of his or her probation. . . . In making its factual determination, the trial court is entitled to draw reasonable and logical inferences from the evidence. . . . Accordingly, [a] challenge to the sufficiency of the evidence is based on the court's factual findings. The proper standard of review is whether the court's findings were clearly erroneous based on the evidence. . . . A court's finding of fact is clearly erroneous and its conclusions drawn from that finding lack sufficient evidence when there is no evidence in the record to support [the court's finding of fact] . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citations omitted; internal quotation marks omitted.) *State* v. *Maurice M.*, 303 Conn. 18, 25–27, 31 A.3d 1063 (2011); see also *State* v. *Davis*, 229 Conn. 285, 301–302, 641 A.2d 370 (1994).

In citing to cases involving criminal prosecutions hereafter, we acknowledge that a probation revocation hearing is not a criminal proceeding, but, instead, "akin to a civil proceeding"; *State* v. *Davis*, supra, 229 Conn.

295; and that "[a]lthough the revocation may be based upon criminal conduct, the constitution does not require that proof of such conduct be sufficient to sustain a criminal conviction." (Internal quotation marks omitted.) *State* v. *Benjamin*, 299 Conn. 223, 235, 9 A.3d 338 (2010); see also *State* v. *Megos*, 176 Conn. App. 133, 139, 170 A.3d 120 (2017). Nevertheless, "there must be proof that the defendant's conduct constituted an act sufficient to support a revocation of probation . . . ." (Internal quotation marks omitted.) *State* v. *Carey*, 30 Conn. App. 346, 349, 620 A.2d 201 (1993), rev'd on other grounds, 228 Conn. 487, 636 A.2d 840 (1994); *Payne* v. *Robinson*, 10 Conn. App. 395, 402–403, 523 A.2d 917 (1987), aff'd, 207 Conn. 565, 541 A.2d 504, cert. denied, 488 U.S. 898, 109 S. Ct. 242, 102 L. Ed. 2d 230 (1988). Therefore, as in the present case, when the defendant is charged with violation of probation on the basis of an alleged violation of a criminal law, the conduct forming the basis of that violation of probation must meet the elements of the relevant crime. The cases involving criminal prosecutions are therefore relevant *qualitatively*, in determining the nature of the alleged conduct at issue.[12]

In the present case, the state charged the defendant with violating § 53a-181 (a) (1) and, on appeal, claims § 53a-181 (a) (3) as an alternative ground for affirmance. See footnote 1 of this opinion. In order to establish a violation of § 53a-181 (a) (1) at a probation revocation hearing, the state must prove, by a preponderance of the evidence, that "(1) the defendant engaged in fighting or in violent, tumultuous or threatening behavior, (2) this conduct occurred in a public place and (3) the defendant acted with the intent to cause inconvenience, annoyance or alarm, or that he recklessly created a risk thereof." (Internal quotation marks omitted.) *State* v. *Adams*, 163 Conn. App. 810, 822, 137 A.3d 108 (2016), rev'd in part on other grounds, 327 Conn. 297, 173 A.3d 943 (2017); see General Statutes § 53a-181 (a) (1).

"Our Supreme Court, in order to ascertain the meaning of § 53a-181 (a) (1), looked to the construction given by this court in *State* v. *Lo Sacco*, 12 Conn. App. 481, 490, 531 A.2d 184, cert. denied, 205 Conn. 814, 533 A.2d 568 (1987), to identical language contained in General Statutes § 53a-181a (a) (1), the public disturbance statute. See *State* v. *Szymkiewicz*, [237 Conn. 613, 618, 678 A.2d 473 (1996)]." (Internal quotation marks omitted.) *State* v. *Adams*, supra, 163 Conn. App. 823. In *State* v. *Lo Sacco*, supra, 481, this court stated that " '[t]hreatening' is defined as a 'promise [of] punishment' or, 'to give signs of the approach of (something evil or unpleasant).' [Webster, Third New International Dictionary.] . . . When, [however] two or more words are grouped together, it is possible to ascertain the meaning of a particular word by reference to its relationship with other associated words and phrases under the doctrine of noscitur a sociis. . . . Placed within the context of

the other words in the statute, the word 'threatening' takes on a more ominous tone. The statute proscribes 'engaging in fighting or in violent, tumultuous, or threatening behavior.' In *State* v. *Duhan*, [38 Conn. Supp. 665, 668, 460 A.2d 496 (1982), rev'd on other grounds, 194 Conn. 347, 481 A.2d 48 (1984)], the Appellate Session of the Superior Court defined 'tumultuous' as 'riotous' and 'turbulent.' Fighting, by its plain meaning, involves physical force. . . . [T]he language of subdivision (1) of General Statutes § 53a-181a (a) involved in this case, namely, 'violent or threatening behavior,' evinces a legislative intent to proscribe conduct which actually involves physical violence or portends imminent physical violence." (Citations omitted.) *State* v. *Lo Sacco*, supra, 490–91.

Likewise, to establish a violation of § 53a-181 (a) (3), the state must prove, by a preponderance of the evidence, that the defendant "(1) threatened to commit a crime against another person or that person's property; (2) with the intent to cause a disturbance to or impediment of a lawful activity, a deep feeling of vexation or provocation, or a feeling of anxiety prompted by threatened danger or harm." (Internal quotation marks omitted.) *State* v. *DeLoreto*, 265 Conn. 145, 159, 827 A.2d 671 (2003); see General Statutes § 53a-181 (a) (3). With the foregoing factual background and legal principles in mind, we turn to the parties' arguments.

I

We first address the state's assertion, and the dissent's position, that the defendant's first amendment right was not implicated in the present case because the trial court reasonably could have concluded that the defendant violated his probation on the basis of his conduct rather than his speech. Specifically, the state, relying on *State* v. *Simmons*, 86 Conn. App. 381, 861 A.2d 537 (2004), cert. denied, 273 Conn. 923, 871 A.2d 1033, cert. denied, 546 U.S. 822, 126 S. Ct. 356, 163 L. Ed. 2d 64 (2005), argues that the defendant's "[threat] . . . [was] simply a component of his disruptive and aggressive conduct while the preschool was still in session." We are not persuaded.

In *State* v. *Simmons*, supra, 86 Conn. App. 384, the defendant assembled an obstacle blocking the path of public travel around the perimeter of Bradley International Airport in Windsor Locks. The obstacle was discovered by members of the Connecticut Army National Guard while conducting a routine security patrol around the perimeter of the airport. See id. The defendant "[aggressively] approached [the guardsmen's] vehicle . . . flailing his arms and yelling. When [he reached] the truck, he shouted profanities at the guardsmen; he told them that they were on his property and that military personnel did not belong there." Id. As a result of this incident, the defendant was charged with, and subsequently convicted of, breach of the

peace in the second degree. See id., 382. In affirming the judgment of the trial court, this court concluded that (1) the evidence was sufficient to convict the defendant of breach of the peace in the second degree; id., 386–87; and (2) the defendant's first amendment claim was "without merit [because] [t]he record reflect[ed] that the court's judgment was based on the defendant's conduct and not his speech." Id., 389.

This court has similarly declined to consider first amendment claims sounding in pure speech where a defendant's physical conduct was augmented by his or her speech. See *State* v. *Bagnaschi*, 180 Conn. App. 835, 850–54,      A.3d      (2018) (sufficient evidence to convict defendant of breach of peace in second degree, where defendant, after greeting victim and shaking hands in parking lot, grabbed victim's hand tightly and would not let go, stated that her employer and victim had ruined her life, directed profanities at victim and passenger in victim's vehicle, and followed victim to his home); *State* v. *Andriulaitis*, 169 Conn. App. 286, 288, 150 A.3d 720 (2016) (sufficient evidence to convict defendant of disorderly conduct, where defendant, in addition to shouting profanities, prevented victim from engaging in lawful activity); *State* v. *Lo Sacco*, supra, 12 Conn. App. 489 (sufficient evidence to convict defendant of creating public disturbance, which is similar to breach of peace, where defendant, who appeared to be heavily intoxicated and was excitable, angry and upset, approached victim's car, put hands on window and leaned into car, and yelled at victim for approximately two minutes despite requests to stop).

In the present case, the trial court stated that its judgments were "[b]ased on the [defendant's] threatening nature and . . . demeanor" without referencing any specific conduct. As we detailed previously, Bevilaqua's testimony reveals that none of the defendant's conduct,[13] either nonverbal or verbal, was threatening until he exited the preschool, made the statement at issue, and attempted to reenter the preschool. The record does not clearly indicate the tone in which the statement was communicated,[14] or that the defendant made any threatening gestures in conjunction with that statement. Furthermore, although the defendant attempted to reenter the preschool after making the statement, we emphasize that there is no evidence in the record describing how the defendant attempted to open the door. Both the state and the dissent posit that the court reasonably could have inferred that the defendant attempted to reenter the preschool in an aggressive manner with the intent to confront Cherney.[15] Although we recognize the trial court's ability to draw reasonable and logical inferences from the evidence; see, e.g., *State* v. *Maurice M.*, supra, 303 Conn. 26; the court stated no such inference in the present case.

Accordingly, we reject the state's claim that there was sufficient evidence to find that the defendant committed breach of the peace in the second degree on the basis of his nonverbal conduct. Cf. *State* v. *Whitnum-Baker*, 169 Conn. App. 523, 527, 150 A.3d 1174 (2016) (sufficient evidence to convict defendant of creating public disturbance in violation of § 53a-181a, where defendant, while being escorted out of public library by state marshals, "engaged in violent and threatening behavior . . . when she attempted to bite [marshal's] arm"), cert. denied, 324 Conn. 923, 155 A.3d 753 (2017); *State* v. *Adams*, supra, 163 Conn. App. 824–25 (sufficient evidence to convict defendant of breach of peace in second degree in violation of § 53a-181 [a] [1], where defendant, suspected of stealing, "used physical force, namely, a shove, with the intent to impede a lawful activity"); *State* v. *Hawley*, 102 Conn. App. 551, 555, 925 A.2d 1197 (sufficient evidence to convict defendant of breach of peace in second degree in violation of § 53a-181 [a] [1], where defendant "engaged in fighting or violent or tumultuous behavior" "by spitting on [nurse's] face"), cert. denied, 284 Conn. 914, 931 A.2d 933 (2007); *State* v. *Samuel*, 57 Conn. App. 64, 70–71, 747 A.2d 21 (sufficient evidence to find violation of probation by engaging in breach of peace, where defendant threw brick through car window), cert. denied, 253 Conn. 909, 753 A.2d 942 (2000).

## II

Because we conclude that the trial count found a violation of probation solely on the basis of the words the defendant used to express his displeasure with Head Start staff, "[f]undamentally, we are called upon to determine whether [his] speech is protected under the first amendment . . . or, rather, constitutes criminal conduct that a civilized and orderly society may punish through incarceration." *State* v. *Baccala*, 326 Conn. 232, 234, 163 A.3d 1, cert. denied,    U.S.    , 138 S. Ct. 510, 199 L. Ed. 2d 408 (2017).

We first set forth our standard of review. "Ordinarily, a . . . trial court's findings of fact are not to be overturned on appeal unless they are clearly erroneous. . . . Thus, we [generally] review the findings of fact made by the . . . trial court in its judgment, for clear error. In certain first amendment contexts, however, appellate courts are bound to apply a de novo standard of review. . . . [In such cases], the inquiry into the protected status of . . . speech is one of law, not fact. . . . As such, an appellate court is compelled to examine for [itself] the . . . statements [at] issue and the circumstances under which they [were] made to [determine] whether . . . they . . . are of a character [that] the principles of the [f]irst [a]mendment . . . protect. . . . [I]n cases raising [f]irst [a]mendment issues [the United States Supreme Court has] repeatedly held that an appellate court has an obligation to make an indepen-

dent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion [in] the field of free expression. . . . This rule of independent review was forged in recognition that a [reviewing] [c]ourt's duty is not limited to the elaboration of constitutional principles . . . . [Rather, an appellate court] must also in proper cases review the evidence to make certain that those principles have been constitutionally applied. . . . Therefore, even though, ordinarily . . . [f]indings of fact . . . shall not be set aside unless clearly erroneous, [appellate courts] are obliged to [perform] a fresh examination of crucial facts under the rule of independent review. . . .

"[T]he heightened scrutiny that this court applies in first amendment cases does not authorize us to make credibility determinations regarding disputed issues of fact. Although we review de novo the trier of fact's ultimate determination that the statements at issue constituted a [breach of the peace in the second degree], we accept all subsidiary credibility determinations and findings that are not clearly erroneous." (Citations omitted; internal quotation marks omitted.) *State* v. *Krijger*, 313 Conn. 434, 446–47, 97 A.3d 946 (2014); see also *State* v. *Parnoff*, 160 Conn. App. 270, 275–76, 125 A.3d 573 (2015), aff'd, 329 Conn. 386,      A.3d      (2018).

Our analysis also is informed by a review of first amendment principles, the statutory elements of the crime of breach of the peace in the second degree and, moreover, how those elements are construed in accordance with constitutional principles. "The [f]irst [a]mendment, applicable to the [s]tates through the [f]ourteenth [a]mendment, provides that Congress shall make no law . . . abridging the freedom of speech. The hallmark of the protection of free speech is to allow free trade in ideas—even ideas that the overwhelming majority of people might find distasteful or discomforting. . . . Thus, the [f]irst [a]mendment ordinarily denies a [s]tate the power to prohibit dissemination of social, economic and political doctrine which a vast majority of its citizens believes to be false and fraught with evil consequence. . . . The [f]irst [a]mendment affords protection to symbolic or expressive conduct as well as to actual speech. . . .

"The protections afforded by the [f]irst [a]mendment, however, are not absolute, and we have long recognized that the government may regulate certain categories of expression consistent with the [c]onstitution. . . . The [f]irst [a]mendment permits restrictions upon the content of speech in a few limited areas, which are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. . . . Thus, for example, a [s]tate may punish those words which by their very utterance inflict injury or tend to incite an immediate breach of the peace. . . . Furthermore,

the constitutional guarantees of free speech . . . do not permit a [s]tate to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action. . . . [T]he [f]irst [a]mendment also permits a [s]tate to ban a true threat." (Citations omitted; internal quotation marks omitted.) *Virginia* v. *Black*, 538 U.S. 343, 358–59, 123 S. Ct. 1536, 155 L. Ed. 2d 535 (2003); see also *State* v. *DeLoreto*, supra, 265 Conn. 153–54.

"[Section] 53a-181 (a) (1) does not require proof of actual physical contact on the part of the defendant with a victim . . . but rather that, when applied to speech, the parameters of the violent, threatening or tumultuous behavior prohibited by § 53a-181 (a) (1) are consistent with fighting words . . . ." (Internal quotation marks omitted.) *State* v. *Parnoff*, supra, 160 Conn. App. 277–78; see also *State* v. *Szymkiewicz*, supra, 237 Conn. 620 ("speech can be proscribed not only when accompanied by actual physical conduct, but also when it can be identified as fighting words that portend physical violence").

Although § 53a-181 (a) (3) criminalizes true threats, it is well established that "[t]hreatening statements that do not rise to the level of a true threat may nonetheless constitute fighting words that could be criminalized under this subsection consistent with the first amendment." *State* v. *DeLoreto*, supra, 265 Conn. 168; see also *State* v. *Gaymon*, 96 Conn. App. 244, 248, 899 A.2d 715, cert. denied, 280 Conn. 906, 907 A.2d 92 (2006).

Therefore, to establish a violation of § 53a-181 (a) under either subdivision (1) or (3), the state was required to prove that the statement, "you better be careful, you better watch yourself," as testified to by Bevilaqua, or the statement, "you better watch your back," as averred to by Kelly in the violation of probation warrant, constituted either fighting words or a true threat. With that legal framework in mind, we consider whether the evidence presented at the defendant's probation revocation hearing was sufficient to establish a violation under either subdivision.

A

We first address the defendant's claim that the evidence adduced at his probation revocation hearing was insufficient to establish that his speech constituted fighting words under either § 53a-181 (a) (1) or (3). Specifically, the defendant argues that his alleged statement was not likely to provoke a violent response from Cherney because it was ambiguous, conditional, and contained no reference to an unlawful act or violence. We agree with the defendant.

We begin by setting forth the applicable legal principles. The fighting words exception was first articulated by the United States Supreme Court in the seminal case

of *Chaplinsky* v. *New Hampshire*, 315 U.S. 568, 573, 62 S. Ct. 766, 86 L. Ed. 1031 (1942). "The *Chaplinsky* doctrine permits the state to prohibit speech that has a direct tendency to inflict injury or to cause acts of violence or a breach of the peace by the persons to whom it is directed." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Szymkiewicz*, supra, 237 Conn. 619. "[Fighting] words touch the raw nerves of one's sense of dignity, decency, and personality and . . . therefore tend to trigger an immediate, violent reaction. . . . They are like sparks, capable of igniting individual reaction as well as setting off a group conflagration by provoking hostile reaction or inciting a riot. . . . Such speech must be of such a nature that it is likely to provoke the average person to retaliation. . . . To be considered fighting words, the speech at issue need not actually cause those who hear the speech to engage in violent, tumultuous or threatening behavior, but must have the tendency to provoke imminent retaliation from them. . . . Moreover, [w]hether particular language constitutes fighting words . . . depends not only on the language but on the full factual situation of its utterance." (Citations omitted; internal quotation marks omitted.) *State* v. *Parnoff*, supra, 160 Conn. App. 278–79.

It is well settled that "there are no per se fighting words; rather, courts must determine on a case-by-case basis all of the circumstances relevant to whether a reasonable person in the position of the actual addressee would have been likely to respond with violence." *State* v. *Baccala*, supra, 326 Conn. 245;[16] see also *State* v. *Hoskins*, 35 Conn. Supp. 587, 591, 401 A.2d 619 (1978) ("The fighting words concept has two aspects. One involves the quality of the words themselves. The other concerns the circumstances under which the words are used." [Internal quotation marks omitted.]). "[A] proper contextual analysis requires consideration of the actual circumstances, as perceived by both a reasonable speaker and addressee, to determine whether there was a likelihood of violent retaliation. This necessarily includes the manner in which the words were uttered, by whom and to whom the words were uttered, and any other attendant circumstances that were objectively apparent and bear on the question of whether a violent response was likely." *State* v. *Baccala*, supra, 250. Furthermore, "[a]lthough the reaction of the addressee is not dispositive . . . it is probative of the likelihood of a violent reaction. (Citation omitted.) Id., 254.

Our analysis is also instructed by this court's decision in *State* v. *Parnoff*, supra, 160 Conn. App. 270. In that case, two employees of a water utility company entered the property of Laurence V. Parnoff to conduct routine maintenance on a fire hydrant located on the property. See id., 272. Parnoff confronted the two men about their presence on his property and "stated that he would

retrieve a gun and shoot them if they did not leave." Id., 273. Parnoff was subsequently convicted after a jury trial of disorderly conduct in violation of General Statutes § 53a-182 (a) (1).[17] On appeal, however, this court concluded that there was insufficient evidence to convict Parnoff of disorderly conduct because his statement did not constitute fighting words. See id., 271–72, 279. In so holding, this court reasoned that his conditional threat did not have "the tendency to provoke imminent retaliation" because there was no evidence that he was carrying a gun or went into his home after making the statement and, therefore, that he was not "immediately capable of the violent act he described." (Emphasis omitted.) Id., 279.

With the foregoing legal principles in mind, and after our independent review of the record, we conclude that the defendant's statement did not constitute fighting words because it did not have the tendency to provoke imminent retaliation from an average person in Cherney's position. Bevilaqua specifically testified that the defendant's conduct was nonthreatening until he stated, "you better be careful, you better watch yourself." Although she testified that the defendant "had words" with staff prior to leaving, her testimony does not shed any light on either what type of words were used or the defendant's mannerisms. See *State* v. *Baccala*, supra, 326 Conn. 241 ("whether the words were preceded by a hostile exchange or accompanied by aggressive behavior will bear on the likelihood of such a reaction"). Additionally, the statement is ambiguous, conditional, and contained no reference to an unlawful or violent act, "further reduc[ing] the probability that the average person would have responded . . . with imminent violence." *State* v. *Parnoff*, supra, 160 Conn. App. 280. Importantly, at the time the defendant made the statement, he had already exited the preschool's inner set of doors and was unable to reenter, and, therefore, incapable of *immediately* following through with his statement.[18] Cf. *State* v. *Baccala*, supra, 253 ("[w]e recognize that a different conclusion might be warranted if the defendant directed the same words at [the victim] after [the victim] ended her work day and left [her place of employment]"). Accordingly, we conclude that the evidence does not sufficiently establish that the defendant violated his probation by committing the crime of breach of the peace in the second degree, in violation of § 53a-181 (a) (1) or (3), under the fighting words exception to speech that is protected under the first amendment.

B

We next consider the defendant's claim that the evidence adduced at his probation revocation hearing was insufficient to establish, by a preponderance of the evidence, that his speech constituted a true threat in violation of § 53a-181 (a) (3). Specifically, the defendant

argues that his "remarks . . . represented an unplanned, spontaneous reaction to the upset and anger he felt." In response, the state contends that the defendant's statement constituted a true threat "in light of the entire factual context." The state, however, failed to adduce sufficient evidence to contextualize the defendant's ambiguous and conditional statement. Accordingly, we agree with the defendant.

We begin with the applicable legal principles. "True threats encompass those statements [through which] the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. . . . The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats protect[s] individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur." (Citations omitted; internal quotation marks omitted.) *Virginia* v. *Black*, supra, 538 U.S. 359–60; see also *State* v. *Cook*, 287 Conn. 237, 250, 947 A.2d 307, cert. denied, 555 U.S. 970, 129 S. Ct. 464, 172 L. Ed. 2d 328 (2008). "In the context of a threat of physical violence, [w]hether a particular statement may properly be considered to be a [true] threat is governed by an objective standard—whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault. . . . [A]lleged threats should be considered in light of their entire factual context, including the surrounding events and reaction of the listeners. . . . Prosecution under a statute prohibiting threatening statements is constitutionally permissible [as] long as the threat on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Krijger*, supra, 313 Conn. 450; cf. *State* v. *Pelella*, 327 Conn. 1, 17, 170 A.3d 647 (2017) ("[t]hough relevant, the primary focus of our inquiry is not immediacy but whether the threat convey[s] a gravity of purpose and likelihood of execution" [internal quotation marks omitted]).

"[T]o ensure that only serious expressions of an intention to commit an act of unlawful violence are punished, as the first amendment requires, the state must do more than demonstrate that a statement *could* be interpreted as a threat. When . . . a statement is susceptible of varying interpretations, at least one of which is nonthreatening, the proper standard to apply is whether an objective listener would readily interpret the statement as a real or true threat; nothing less is sufficient to safeguard the constitutional guarantee of freedom of expression. To meet this standard . . . the state [is]

required to present evidence demonstrating that a reasonable listener, familiar with the entire factual context of the defendant's statements, would be *highly likely* to interpret them as a communicating a genuine threat of violence rather than protected expression, however offensive or repugnant." (Emphasis altered.) *State* v. *Krijger*, supra, 313 Conn. 460; see also *State* v. *Krijger*, 130 Conn. App. 470, 484–85, 24 A.3d 42 (2011) (*Lavine*, *J.*, dissenting), rev'd, 313 Conn. 434, 446–47, 97 A.3d 946 (2014) (adopting Appellate Court dissent's position). "An important factor to be considered in determining whether a facially ambiguous statement constitutes a true threat is the prior relationship between the parties. When the alleged threat is made in the context of an existing or increasingly hostile relationship, courts are more apt to conclude that an objectively reasonable speaker would expect that the statement would be perceived by the listener as a genuine threat." *State* v. *Krijger*, supra, 453–54; see also *State* v. *Pelella*, supra, 327 Conn. 6 (concluding that, where history of physical acts of violence toward victim, evidence was sufficient for jury to determine whether defendant's statement, "if you go into the attic I will hurt you," constituted true threat).

With the foregoing legal principles in mind, we conclude that the defendant's statement did not constitute a true threat. Several factors bear on our conclusion. To begin, we emphasize that neither of the statements, "you better watch yourself, you better be careful," or, "you better watch your back," communicate an explicit threat or convey the defendant's intent to harm or assault Cherney. Cf. *State* v. *Cook*, supra, 287 Conn. 240 (defendant told victim, "[t]his is for you if you bother me anymore," while wielding wooden table leg [internal quotation marks omitted]); *State* v. *DeLoreto*, supra, 265 Conn. 149 (defendant jumped out of car as victim was jogging by, ran toward victim, pumped his fists and stated, "I'm going to kick your ass" [internal quotation marks omitted]); *State* v. *Gaymon*, supra, 96 Conn. App. 249 (defendant, after being placed in handcuffs, told probation officer, "I'm going to kick your fucking ass," and spat in his face [internal quotation marks omitted]). Instead, the defendant's statement and attempt to reenter the preschool was susceptible of being interpreted as either innocent or threatening conditional future conduct.[19] For that reason, it was the state's "burden [to present] evidence serving to remove that ambiguity" by contextualizing the defendant's statement against the backdrop of his previous interactions with preschool staff and, specifically, Cherney. (Internal quotation marks omitted.) *State* v. *Krijger*, supra, 313 Conn. 458.

The state, acknowledging that the defendant's statement was not explicitly threatening, attempts to resolve the ambiguity by relying on (1) Bevilaqua's testimony that she had previously witnessed the defendant engage in similar conduct at the preschool, and (2) the defen-

dant's history of threatening and assaultive behavior. There is, however, no evidence that Cherney had previously witnessed this prior behavior or had knowledge of the defendant's prior convictions. Simply put, the state was required "to do more than demonstrate that [the defendant's] statement could be interpreted as a threat." (Emphasis omitted.) Id., 460. Therefore, in light of the unresolved ambiguity of the defendant's statement, we cannot conclude that a reasonable listener would be highly likely to interpret the defendant's statement as a serious expression of intent to harm or assault. Accordingly, we conclude that the evidence does not sufficiently establish that the defendant violated his probation by committing the crime of breach of the peace in the second degree, in violation of § 53a-181 (a) (3), under the true threat exception to speech that is protected under the first amendment.

In sum, we conclude that, under the circumstances of the present case, the evidence adduced at the defendant's probation revocation hearing was insufficient to establish that the defendant's statement constituted either fighting words or a true threat. Because the defendant's speech did not fall within those two narrowly defined categories of unprotected speech, the revocation of his probation on the basis of his speech violates the first amendment to the United States constitution.

The judgments are reversed and the cases are remanded with direction to render judgments for the defendant.

In this opinion SHELDON, J., concurred.

[1] The record does not indicate what subdivision was specified, either as charged by the state or as found by the trial court. At the probation revocation hearing, however, the state proceeded under the theory that the defendant had committed a breach of the peace on the basis of his "threatening and violent behavior" at his child's preschool, and referred to the statutory language of § 53a-181 (a) (1) in its closing argument. Section 53a-181 (a) provides in relevant part: "A person is guilty of breach of the peace in the second degree when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person . . . (1) Engages in fighting or in violent, tumultuous or threatening behavior in a public place . . . . For purposes of this section, 'public place' means any area that is used or held out for use by the public whether owned or operated by public or private interests." General Statutes § 53a-181 (a).

On appeal, the state claims § 53a-181 (a) (3) as an alternative ground for affirmance. Section 53a-181 (a) provides in relevant part: "A person is guilty of breach of the peace in the second degree when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person . . . (3) threatens to commit any crime against another person or such other person's property . . . ." General Statutes § 53a-181 (a).

[2] The defendant also claims that (1) the trial court improperly admitted hearsay testimony, and (2) the trial court's finding that he had violated his probation was clearly erroneous, as the only evidence adduced at his probation revocation hearing was unreliable, uncorroborated hearsay testimony admitted in violation of his constitutional right to due process. We address the defendant's sufficiency of the evidence claim before we address any other claim because if a defendant prevails on such a claim in the context of a violation of probation proceeding, the appropriate remedy is to reverse the judgment of the trial court and to remand the case with direction to render judgment in favor of the defendant. See *State* v. *Maurice M.*, 303 Conn. 18, 44, 31 A.3d 1063 (2011); *State* v. *Acker*, 166 Conn. App. 404, 408, 141 A.3d 938 (2016); *State* v. *Edwards*, 148 Conn. App. 760, 769, 87 A.3d 1144 (2014); *State* v. *Fermaint*, 91 Conn. App. 650, 663, 881 A.2d

539, cert. denied, 276 Conn. 922, 888 A.2d 90 (2005).

The state, relying on *State* v. *McDowell*, 242 Conn. 648, 653–54, 699 A.2d 987 (1997) (holding that principles of double jeopardy do not bar criminal trial on underlying charges after defendant found in violation of probation), argues that "even if the evidence was insufficient, the defendant should not be entitled to an acquittal, but rather a new probation revocation hearing because the double jeopardy bar attaches only to proceedings that are essentially criminal, and probation revocation hearings are not criminal proceedings." We are not persuaded. Our Supreme Court has not addressed whether its holding in *McDowell* would permit the state to commence a second probation revocation proceeding on the same set of underlying facts, following a court's conclusion that the state adduced insufficient evidence to support a revocation at the first proceeding. See *State* v. *Daniels*, 248 Conn. 64, 71 n.9, 726 A.2d 520 (1999) ("[b]ecause we conclude that . . . the evidence adduced at the probation revocation hearing was sufficient to establish a probation violation . . . we need not consider the appropriate relief to be afforded a defendant in a case in which the evidence was insufficient to establish a violation"), overruled in part on other grounds by *State* v. *Singleton*, 274 Conn. 426, 436–39, 876 A.2d 1 (2005). Furthermore, we are persuaded by decisions following *McDowell* and *Daniels*, in which our Supreme Court and this court have reversed the judgment of the trial court and remanded the case with direction to render judgment in favor of the defendant. See, e.g., *State* v. *Maurice M.*, supra, 303 Conn. 44; *State* v. *Acker*, supra, 166 Conn. App. 408.

[3] As we discuss subsequently, "fighting words" are those words that "have a direct tendency to cause acts of violence by the persons to whom, individually, the remark is addressed." (Internal quotation marks omitted.) *Chaplinsky* v. *New Hampshire*, 315 U.S. 568, 573, 62 S. Ct. 766, 86 L. Ed. 1031 (1942). A "true threat" is "a serious expression of an intent to commit an act of unlawful violence against another . . . ." *State* v. *Cook*, 287 Conn. 237, 239, 947 A.2d 307, cert. denied, 555 U.S. 970, 129 S. Ct. 464, 172 L. Ed. 2d 328 (2008).

[4] Because we conclude that the judgment of the trial court must be reversed on the basis of insufficient evidence, we do not reach the defendant's other two claims. See footnote 2 of this opinion.

[5] The record does not specify which staff member called the defendant. Furthermore, the record does not reveal the content or tone of that telephone call, other than a conversation regarding whether the defendant would be picking up his child.

[6] The preschool has two sets of double doors. One external set opens on the outside. A second set, inside the first, opens into the preschool. As a parent exits the second set, the door locks behind them.

[7] At the probation revocation hearing, Bevilaqua testified that she asked Danbury police that the defendant not be allowed back to the preschool and that she looked into whether Head Start could obtain a restraining order to keep him off the property. Bevilaqua further testified that Head Start hired a police officer to be at the preschool the next morning.

[8] General Statutes § 53a-32 provides in relevant part: "(a) At any time during the period of probation or conditional discharge, the court or any judge thereof may issue a warrant for the arrest of a defendant for violation of any of the conditions of probation . . . .

"(c) . . . [U]pon an arrest by warrant as herein provided, the court shall cause the defendant to be brought before it without unnecessary delay for a hearing on the violation charges. At such hearing the defendant shall be informed of the manner in which such defendant is alleged to have violated the conditions of such defendant's probation . . . and . . . shall have the right to cross-examine witnesses and to present evidence in such defendant's own behalf. . . .

"(d) If such violation is established, the court may . . . revoke the sentence of probation . . . [and] . . . require the defendant to serve the sentence imposed or impose any lesser sentence. . . . No such revocation shall be ordered, except upon consideration of the whole record and unless such violation is established by . . . reliable and probative evidence . . . ."

[9] On May 15, 2015, the trial court granted the state's motion to consolidate the three informations pursuant to Practice Book § 41-19.

[10] Although the state charged the defendant with violating his probation on the basis of both the March 11, 2014 incident and April 16, 2014 arrest, it did not present any testimony regarding the April 16, 2014 arrest at the probation revocation hearing.

[11] We note that the violation of probation warrant was admitted as court's exhibit A. Neither defense counsel nor the state objected to admission of

the warrant as a full exhibit. The violation of probation warrant provided, in relevant part: "On [March 11, 2014], the Danbury Police Department was dispatched to the Head Start Program regarding a dispute involving [the defendant]. [The defendant] was forty minutes late picking up his child at [Head Start] and [staff] reminded [the defendant] that he needed to pick his child up on time. [The defendant] became extremely agitated and began to argue with staff. Staff told [the defendant] that he had to leave because he was arguing with staff in the front lobby in front of other children and their parents. [The defendant] then yelled to the staff 'you better watch your back'. Staff reported to the Danbury Police that [the defendant] was so enraged and intimidating that the school hired a police officer for security the next morning in the event that [the defendant] came back."

[12] We therefore disagree with the dissent's position that "[c]riminal cases . . . in which the beyond a reasonable doubt burden of proof applied . . . are distinguishable from the present case . . . ."

[13] The dissent takes issue with our position that the defendant's conduct was not threatening until exiting the preschool, stating that "Bevilaqua nonetheless did not testify that the defendant's behavior was not threatening at that time." (Emphasis omitted.) Bevilaqua, however, did not testify regarding any threatening conduct while the defendant was inside the preschool. In fact, at oral argument before this court, when asked to "talk about the conduct that constitutes the threat" the state was unable to direct us to any physical conduct other than the defendant's attempt to open the preschool's inner set of doors.

[14] To that extent, we reiterate that Bevilaqua testified that the defendant, in response to a comment made by Cherney, said, "you better watch yourself, you better be careful"; whereas, Kelly, in his affidavit accompanying the warrant, averred that the defendant yelled to unidentified staff, "you better watch your back . . . ." See footnote 11 of this opinion.

[15] We disagree with the dissent's position that the defendant's prior convictions, which were admitted into evidence, "properly informed the court's perspective" in determining that the defendant engaged in certain conduct in violation of § 53a-181 (a). Evidence of the defendant's prior bad acts or uncharged misconduct was irrelevant to the trial court's determination regarding the nature of his alleged conduct at the preschool. As we subsequently explain in part II of this opinion, Head Start staff's knowledge of the defendant's prior convictions may have been relevant; however, no such testimony was elicited by the state.

[16] Although the defendant in *Baccala* was convicted under a different subdivision of the breach of the peace statute, § 53a-181 (a) (5), we note that the case was analyzed under the fighting words exception.

[17] We note that elements of breach of the peace in the second degree are identical to the elements of disorderly conduct, except that breach of the peace in the second degree requires that the proscribed conduct occur in a public place. See General Statutes § 53a-181 (a) (1).

[18] We further note that, although Bevilaqua generally testified that her staff was "shaken up," there is no evidence in the record regarding Cherney's reaction to the defendant's statement. See *State* v. *Parnoff*, supra, 160 Conn. App. 280 n.6 (noting that although speech need not actually cause those hearing it to respond with immediate violence to constitute fighting words, "it [was] telling that neither [of the two employees] reacted violently in response to [Parnoff's] statement or testified that they had the urge to do so").

[19] As we have previously detailed, there is no evidence describing how the defendant communicated that statement to Cherney, or that he made any threatening gestures in conjunction with that statement.