# STATE OF CONNECTICUT *v.* KERLYN M. TAVERAS
## (SC 20496)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Kahn, Ecker and Keller, Js.

*Syllabus*

The defendant appealed from the judgments of the trial court revoking his
probation. The defendant previously had pleaded guilty to various crimes
and received a sentence of imprisonment followed by a term of proba-
tion. The conditions of the defendant's probation prohibited him from
violating any state or federal criminal law. While the defendant was
serving his term of probation, he precipitated an incident at his son's
preschool. On the day of the incident, B, the preschool's director,
received a call from her staff informing her that the defendant was late
in picking up his son. B's staff members reported that the defendant
arrived in an escalated emotional state and began arguing with them.
C, one of the staff members, said something to the defendant as he was
exiting the preschool with his son, and, according to an affidavit from
the defendant's probation officer, the defendant said to C, "you better
watch your back." The defendant tried to get back in the door but
was unable to, and then left the preschool. After the state charged the
defendant with violating the terms of his probation, the trial court held

---

[12] In accordance with the aggregate package theory, we vacate the defen-
dant's sentence in its entirety and remand not only for sentencing on the
intentional manslaughter conviction, but also for resentencing on the convic-
tions that were not vacated by the Appellate Court, namely, risk of injury
to a child and evasion of responsibility in the operation of a motor vehicle.
See, e.g., *State* v. *LaFleur*, 307 Conn. 115, 164, 51 A.3d 1048 (2012) ("Pursuant
to [the aggregate package] theory, we must vacate a sentence in its entirety
when we invalidate any part of the total sentence. On remand, the resentenc-
ing court may reconstruct the sentencing package or, alternatively, leave the
sentence for the remaining valid conviction or convictions intact." (Internal
quotation marks omitted.)).

State *v.* Taveras

an evidentiary hearing. The court found, by a preponderance of the evidence, that the state met its burden of proving that the defendant had violated the terms of his probation by committing breach of the peace in the second degree. The court specifically found that the defendant had exhibited a threatening nature and demeanor, and that his conduct caused B to call the police. Accordingly, the court rendered judgments revoking the defendant's probation. On appeal to the Appellate Court, the defendant claimed that his remarks were protected by the first amendment to the United States constitution. The Appellate Court agreed with the defendant and reversed the judgments of the trial court, reasoning that the defendant's remarks had not conveyed an explicit threat and that the state had failed to provide sufficient context to resolve the resulting ambiguity. The state, on the granting of certification, appealed to this court. *Held* that the Appellate Court incorrectly determined that the defendant's remarks warranted first amendment protection, as the defendant's statements and demeanor, as well as the surrounding context, were sufficient to support a finding that the defendant's remarks constituted true threats: although the phrase "you better watch your back" can be used to caution an addressee of an external threat, it can also be used as a veiled or conditional threat of violence, the record did not suggest that the defendant's remarks were intended to convey the former sentiment, and the defendant's history at the preschool, his demeanor during the incident in question, and the subsequent reactions of the preschool staff appeared objectively to indicate the threat of the possibility of violence; moreover, B stated that the defendant had previously caused escalated interactions at the preschool and that she previously had seen the defendant act in a threatening manner, and the fact that preschool employees notified B of the defendant's late arrival before it occurred and that B immediately returned to the preschool because she knew things would escalate indicated that the defendant had made his remarks in the context of an existing hostile relationship; furthermore, B testified that, when she arrived at the preschool shortly after the incident, the staff was shaken up and concerned by what had transpired, B immediately contacted the police, formally prohibited the defendant from reentering the preschool, began to pursue a restraining order, and hired a police office for additional security the following day, all of which reasonably suggested a specific fear of physical violence; accordingly, this court reversed the judgment of the Appellate Court and remanded the case for the Appellate Court to consider the defendant's remaining appellate claims.

(*Three justices concurring separately in two opinions*)

Argued November 16, 2021—officially released March 29, 2022

*Procedural History*

Three substitute informations charging the defendant with violation of probation, brought to the Superior

State *v.* Taveras

Court in the judicial district of Danbury, geographical area number three, where the cases were consolidated and tried to the court, *Russo, J.*; judgments revoking the defendant's probation, from which the defendant appealed to the Appellate Court, *Sheldon* and *Eveleigh, Js.*, with *Elgo, J.*, dissenting, which reversed the trial court's judgments and remanded the cases with direction to render judgments for the defendant, and the state, on the granting of certification, appealed to this court. *Reversed*; *further proceedings*.

*Mitchell S. Brody*, senior assistant state's attorney, with whom, on the brief, were *Stephen J. Sedensky III* and *Sharmese L. Walcott*, state's attorneys, for the appellant (state).

*James B. Streeto*, senior assistant public defender, for the appellee (defendant).

*Opinion*

KAHN, J. The principal issue in this case is whether the first amendment to the United States constitution protects certain allegedly threatening remarks made by the defendant, Kerlyn M. Taveras, to the employees of his son's preschool in Danbury. In this certified appeal, the state claims that the Appellate Court incorrectly concluded that the evidence contained in the record precluded application of the true threats exception and, as a result, improperly reversed the judgments of the trial court revoking the defendant's probation pursuant to General Statutes § 53a-32 on the basis of that evidence. The defendant, in response, argues that the Appellate Court's analysis on the point was sound, and that his conduct on the day of the incident in question warrants first amendment protection. For the reasons that follow, we agree with the state and, accordingly, reverse the judgment of the Appellate Court.

State *v.* Taveras

The following evidence, adduced at the defendant's probation revocation hearing, and procedural history are relevant to our consideration of this appeal. The record establishes that the defendant had been previously charged with, and pleaded guilty to, the following offenses in three separate criminal cases: (1) threatening in the second degree in violation of General Statutes § 53a-62 (a) (3) in connection with an incident that occurred on or about September 17, 2009; (2) assault in the third degree in violation of General Statutes § 53a-61 (a) (1) in connection with an incident that occurred on or about June 30, 2011; and (3) threatening in the second degree in violation of § 53a-62 (a) (3) in connection with an incident that occurred on or about July 28, 2011. The trial court accepted those pleas and, on August 22, 2012, imposed a total effective sentence on those charges of three years of incarceration, execution suspended after twelve months, followed by three years of probation.[1] The defendant's term of probation on these charges began on July 1, 2013. On August 28, 2012, and then again on April 25, 2013, the defendant agreed to the standard conditions of probation set forth on Judicial Branch Form JD-AP-110. Those conditions expressly prohibited the defendant from, among other things, "violat[ing] any criminal law of the United States, this state or any other state or territory."

On March 11, 2014, approximately eight months into his term of probation, the defendant precipitated an incident at his son's preschool in Danbury. The evidence contained in the record about that event comes almost exclusively from two distinct sources: (1) testimony from the preschool's director, Monica Bevilaqua; and

[1] We note that, because the sentences of incarceration imposed on each of these convictions were to run consecutively, rather than concurrently, the Appellate Court's recitation of the defendant's total effective sentence was technically inaccurate. See *State* v. *Taveras*, 183 Conn. App. 354, 359, 193 A.3d 561 (2018).

State *v.* Taveras

(2) an affidavit from the defendant's probation officer, Christopher Kelly, dated April 17, 2014, requesting the issuance of a warrant for a violation of the defendant's probation.[2] We review these two accounts in turn.

First, Bevilaqua testified that the defendant's son was one of about four hundred students enrolled at the preschool and that his child's scheduled hours were 8:30 a.m. to 4 p.m. Shortly after 4 p.m. on March 11, 2014, Bevilaqua, who was not then physically present at the preschool, received a call from her staff informing her that the defendant was late for pickup. Pursuant to standard policy, preschool staff had reached out to the defendant by phone to ask where he was. Bevilaqua testified that the defendant was "not happy" about this call but that he had, nonetheless, told staff that he was on his way.

According to reports from Bevilaqua's staff, the defendant eventually arrived at the preschool at approximately 4:40 p.m. in an "already escalated" emotional state, went down to his child's classroom, and then began arguing with staff on his way out. Sondra Cherney, the preschool's assistant education manager, then said something to the defendant as he was exiting the preschool through a set of locked doors. Bevilaqua testi-

_____

[2] Kelly's affidavit was admitted as a full exhibit without objection. Although defense counsel objected to portions of Bevilaqua's testimony on hearsay grounds, the trial court overruled that objection. In a subsequent articulation, the trial court expressed its view that, although Bevilaqua's testimony constituted hearsay, it was nonetheless admissible for the purpose of proving the defendant's violation of probation because it was "relevant, reliable, and probative." See, e.g., *State* v. *Gumbs*, 94 Conn. App. 747, 751, 894 A.2d 396, cert. denied, 278 Conn. 917, 899 A.2d 622 (2006). The defendant assigned error to the admission of this testimony in his initial appeal, but the Appellate Court declined to reach that issue in its decision. See *State* v. *Taveras*, supra, 183 Conn. App. 357 n.2. In briefing the present appeal, the defendant has argued only that the whole of the state's evidence, including Bevilaqua's testimony, is insufficient to support the trial court's judgments. Questions related to the admissibility of Bevilaqua's testimony were neither briefed nor argued before this court.

State *v.* Taveras

fied that, in response to Cherney's comment, the defendant turned around and said, "you better watch yourself, you better be careful . . . ." Bevilaqua indicated that the defendant then "tried to get back in the door and couldn't, and then he left."

Other portions of Bevilaqua's testimony provide the following additional factual context. Bevilaqua indicated that this situation was not the staff's first "escalated interaction" with the defendant. Although the details of these previous interactions were not expressly drawn out at the hearing, Bevilaqua clearly testified that she herself had previously witnessed the defendant acting in a threatening manner. Indeed, Bevilaqua stated that she made the decision to return to the preschool as soon as she heard that the defendant was going to be late because she "knew it would get escalated." When she got to the preschool, she found that members of her staff were "shaken up" and "concerned" by what had transpired. Bevilaqua also stated that, in order to protect those at the preschool, she immediately contacted the police, formally prohibited the defendant from reentering the preschool, began pursuing a restraining order, and hired a police officer for additional security the following day.

Kelly's affidavit provides the following similar account of events: "[On March 11, 2014, police officers were] dispatched to [a preschool for] a dispute involving [the defendant]. [The defendant] was forty minutes late picking up his child . . . and [was] . . . reminded . . . that he needed to pick his child up on time. [The defendant] became extremely agitated and began to argue with staff. Staff told [the defendant] that he had to leave because he was arguing with staff in the front lobby in front of other children and their parents. [The defendant] then yelled to the staff 'you better watch your back.' Staff reported . . . that [the defendant] was so enraged and intimidating that the school hired a police

State *v.* Taveras

officer for security the next morning in the event [the defendant] came back. [The defendant] agreed to meet [police officers] the next morning and was arrested for breach of [the] peace. [The defendant] was advised not to return to the school again, otherwise he would be arrested for criminal [t]respass.''

The state subsequently sought revocation of the defendant's probation as a result of the defendant's conduct on March 11, 2014.[3] During the hearing that followed, the state proceeded on the theory that the foregoing testimony and evidence were sufficient to prove that the defendant had violated the terms of his probation by committing breach of the peace in the second degree, in violation of General Statutes § 53a-181 (a).[4]

On the basis of this testimony, the trial court found that the state had met its burden of proving, by a preponderance of the evidence, that the defendant had violated the standard terms of his probation by violating § 53a-

[3] The state also charged the defendant with violating the terms of his probation during a completely separate incident on April 16, 2014, but presented no evidence with respect to that alleged violation at the defendant's hearing. See *State* v. *Taveras*, supra, 183 Conn. App. 361 n.10.

[4] General Statutes § 53a-181 (a) provides in relevant part: "A person is guilty of breach of the peace in the second degree when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person: (1) Engages in fighting or in violent, tumultuous or threatening behavior in a public place; or . . . (3) threatens to commit any crime against another person or such other person's property . . . . For purposes of this section, 'public place' means any area that is used or held out for use by the public whether owned or operated by public or private interests."

Although portions of the prosecutor's arguments before the trial court appear to track the language of § 53a-181 (a) (1), the state subsequently relied on § 53a-181 (a) (3) as an alternative ground for affirmance when arguing the case before the Appellate Court. The Appellate Court subsequently examined the sufficiency of the state's evidence under both subdivisions of § 53a-181 (a). *State* v. *Taveras*, supra, 183 Conn. App. 373–74. The defendant raises no objection to that approach in the present appeal and, instead, argues only that the Appellate Court correctly concluded that the state's evidence fell short under either statutory provision.

State *v.* Taveras

181 (a). In ruling in favor of the state on the adjudicatory phase of the proceeding, the trial court explicitly found that the defendant had exhibited a "threatening nature and demeanor" and that his conduct had caused Bevila-qua to contact the police. In its ruling, the trial court acknowledged, and implicitly rejected, defense counsel's argument that the facts of the present case demonstrated nothing more than that "[a person] being upset with the way [a] daycare . . . handles [his] child . . . ." After the dispositional phase of the hearing, the trial court rendered judgments revoking the defendant's various terms of probation and sentenced him to a total effective term of eighteen months of incarceration.

The defendant then appealed from the trial court's judgments to the Appellate Court, claiming, inter alia, that the evidence presented at his probation revocation hearing was insufficient to support a finding that he had violated the terms of his probation. *State* v. *Taveras*, 183 Conn. App. 354, 357, 193 A.3d 561 (2018). Specifically, the defendant argued that the state's evidence was insufficient to establish that his remarks constituted a true threat and, therefore, that they warranted first amendment protection. Id., 357–58. The Appellate Court, in a split decision, agreed with the defendant and reversed the judgments of the trial court, reasoning that the defendant's remarks did not convey an explicit threat and that the state had failed to provide sufficient context to resolve the resulting ambiguity. See id., 380–81. Judge Elgo authored a dissent in which she concluded that, in light of the lower standard of proof applicable to probation proceedings, there was sufficient evidence to support the trial court's revocation of the defendant's probation. Id., 387–88. This certified appeal followed.[5]

_____

[5] During oral argument before this court, the state abandoned any challenge to the Appellate Court's conclusion that the defendant's speech did not rise to the level of fighting words. See, e.g., *Chaplinsky* v. *New Hampshire*, 315 U.S. 568, 573, 62 S. Ct. 766, 86 L. Ed. 1031 (1942).

State *v.* Taveras

The standard of review and constitutional principles governing our review of the Appellate Court's true threats analysis are well established. "The [f]irst [a]mendment, applicable to the [s]tates through the [f]ourteenth [a]mendment, provides that Congress shall make no law . . . abridging the freedom of speech. The hallmark of the protection of free speech is to allow free trade in ideas—even ideas that the overwhelming majority of people might find distasteful or discomforting. . . . Thus, the [f]irst [a]mendment ordinarily denies a [s]tate the power to prohibit dissemination of social, economic and political doctrine [that] a vast majority of its citizens believes to be false and fraught with evil consequence . . . .

"The protections afforded by the [f]irst [a]mendment, however, are not absolute, and we have long recognized that the government may regulate certain categories of expression consistent with the [c]onstitution. . . . The [f]irst [a]mendment permits restrictions [on] the content of speech in a few limited areas, which are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality. . . .

"The first amendment permits states to restrict true threats, which encompass those statements [through which] the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. . . . The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats protect[s] individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur. . . .

"Thus, we must distinguish between true threats, which, because of their lack of communicative value,

State *v.* Taveras

are not protected by the first amendment, and those statements that seek to communicate a belief or idea, such as political hyperbole or a mere joke, which are protected. . . . In the context of a threat of physical violence, [w]hether a particular statement may properly be considered to be a [true] threat is governed by an objective standard—whether a reasonable person would foresee that the statement would be interpreted by those to whom the maker communicates the statement as a serious expression of intent to harm or assault. . . . [A]lleged threats should be considered in light of their entire factual context, including the surrounding events and reaction of the listeners. . . .

"[T]o ensure that only *serious* expressions of an intention to commit an act of unlawful violence are punished, as the first amendment requires, the state . . . must do more than demonstrate that a statement *could* be interpreted as a threat. When . . . a statement is susceptible of varying interpretations, at least one of which is nonthreatening, the proper standard to apply is whether an objective listener would readily interpret the statement as a real or true threat; nothing less is sufficient to safeguard the constitutional guarantee of freedom of expression. To meet this standard [the state is] required to present evidence demonstrating that a reasonable listener, familiar with the entire factual context of the defendant's statements, would be *highly likely* to interpret them as communicating a genuine threat of violence rather than protected expression, however offensive or repugnant." (Citations omitted; emphasis altered; footnote omitted; internal quotation marks omitted.) *Haughwout* v. *Tordenti*, 332 Conn. 559, 570–72, 211 A.3d 1 (2019); see also *State* v. *Taupier*, 330 Conn. 149, 193–94, 193 A.3d 1 (2018), cert. denied,           U.S.      , 139 S. Ct. 1188, 203 L. Ed. 2d 202 (2019).

"In determining whether the trial court properly found that the defendant's statements and gestures were true

State *v.* Taveras

threats, we recognize that, although we ordinarily review findings of fact for clear error, [i]n certain first amendment contexts . . . appellate courts are bound to apply a de novo standard of review. . . . [In such cases] the inquiry into the protected status of . . . speech is one of law, not fact. . . . As such, an appellate court is compelled to examine for [itself] the . . . statements [at] issue and the circumstances under which they [were] made to [determine] whether . . . they . . . are of a character [that] the principles of the [f]irst [a]mendment . . . protect. . . . [I]n cases raising [f]irst [a]mendment issues [the United States Supreme Court has] repeatedly held that an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion [in] the field of free expression. . . . This rule of independent review was forged in recognition that a [reviewing] [c]ourt's duty is not limited to the elaboration of constitutional principles . . . . [Rather, an appellate court] must also in proper cases review the evidence to make certain that those principles have been constitutionally applied. . . . Therefore, even though, ordinarily . . . [f]indings of fact . . . shall not be set aside unless clearly erroneous, [appellate courts] are obliged to [perform] a fresh examination of crucial facts under the rule of independent review. . . . We emphasize, however, that the heightened scrutiny that this court applies in first amendment cases does not authorize us to make credibility determinations regarding disputed issues of fact. Although we review de novo the trier of fact's ultimate determination that the statements at issue constituted a true threat, we accept all subsidiary credibility determinations and findings that are not clearly erroneous.'' (Citations omitted; internal quotation marks omitted.) *Haughwout* v. *Tordenti*, supra, 332 Conn. 572–73. The defendant concedes that,

State *v.* Taveras

because he is charged with a violation of probation, a preponderance of the evidence standard governed the trial court's findings of historical fact. See, e.g., *State* v. *Davis*, 229 Conn. 285, 290–91, 641 A.2d 370 (1994); see also *Haughwout* v. *Tordenti*, supra, 586 n.20 (conducting true threats analysis within context of "record as reflected by the lower burden of proof in civil cases").

Our independent examination of the present case is guided, in particular, by this court's decision in *State* v. *Krijger*, 313 Conn. 434, 97 A.3d 946 (2014). The defendant in that case had been engaged in a long-standing zoning dispute with the town of Waterford. Id., 436, 438. Although the defendant had been "pleasant and cooperative" with the town's attorney on dozens of previous occasions, he became upset after a particular court hearing, followed the town's attorney out of the courthouse, and began yelling. (Internal quotation marks omitted.) Id., 438–40. The defendant told the attorney that "[m]ore of what happened to your son is going to happen to you" and that he was "going to be there to watch it happen." (Internal quotation marks omitted.) Id., 440. The attorney, whose son had been injured in a highly publicized car accident, responded by calling the defendant "a piece of shit" and eventually walked away. (Internal quotation marks omitted.) Id., 440–41 and n.6. Before the attorney reached his car, he was approached once again by the defendant, who then apologized for his outburst. Id., 442. Although the attorney did not initially perceive the defendant's comments as a threat, he eventually filed a complaint with the police department two days later. Id. The defendant was later charged with threatening in the second degree. Id.

We began our examination of the first amendment issue in *Krijger* by recognizing that the "absence of explicitly threatening language [did] not preclude the finding of a threat . . . ." (Internal quotation marks omitted.) Id., 453; see *Planned Parenthood of the*

State *v.* Taveras

*Columbia/Willamette, Inc.* v. *American Coalition of Life Activists*, 290 F.3d 1058, 1078–79 (9th Cir. 2002) ("context is critical in a true threats case . . . because without context, a burning cross or dead rat mean nothing" (citation omitted; footnotes omitted)), cert. denied, 539 U.S. 958, 123 S. Ct. 2637, 156 L. Ed. 2d 655 (2003); *United States* v. *Malik*, 16 F.3d 45, 50 (2d Cir.) ("rigid adherence to the literal meaning of a communication without regard to its reasonable connotations derived from its ambience would render [statutes proscribing true threats] powerless against the ingenuity of threateners who can instill in the victim's mind as clear an apprehension of impending injury by an implied menace as by a literal threat"), cert. denied, 513 U.S. 968, 115 S. Ct. 435, 130 L. Ed. 2d 347 (1994); see also *Haughwout* v. *Tordenti*, supra, 332 Conn. 575 ("[p]ut differently, even veiled statements may be true threats").

To discern the true nature of the defendant's expression in *Krijger*, we looked to the context provided by both the prior relationship between the parties and the particular circumstances surrounding the alleged threat itself. *State* v. *Krijger*, supra, 313 Conn. 454. First, we observed that the case was "not [one] in which one's prior hostile acts or menacing behavior provided a clarifying lens through which to view an ambiguous threat" because the defendant and the town attorney had an established relationship that, despite its adversarial nature, had always been "cordial and professional." Id. Second, we noted that the alleged threats followed a surprisingly contentious court hearing, that the attorney did not initially view the defendant's remarks as a threat, and that the defendant had apologized shortly after making the remarks in question. Id., 454–55. On the basis of the facts presented, we concluded that a reasonable person would have viewed the defendant's remarks as a crude, but ultimately benign, way of simply

State *v.* Taveras

saying " 'what goes around comes around' " and reversed the defendant's conviction. Id., 456, 461.

The facts underlyng the present case differ significantly from those considered in *Krijger*. Although the phrase "you better watch your back"[6] can, in some contexts, be used to sincerely caution an addressee of an impending threat from some external source, it can also be used as a veiled or conditional threat of violence. See, e.g., *State* v. *Lewis*, Docket No. 96-P-0272 (DRF), 1997 WL 589914, *3 (Ohio App. August 22, 1997) ("A statement such as 'you better watch your back' is what is known in law as a conditional threat. . . . Even in the absence of a reference to a specific action, the logical import of such a statement is that the person is being threatened with potential physical harm." (Citations omitted.)).[7] The record is bereft of any suggestion that the defendant's decision to yell these words at Cherney was intended to convey the former sentiment. See *State* v. *Taveras*, supra, 183 Conn. App. 390 (*Elgo, J.*, dissenting.) ("[t]his is not a case of a bystander alerting a pedestrian to an errant vehicle"). The defendant's history at the preschool, his general demeanor during the course of this particular incident itself, and the subsequent reactions of the preschool's staff, on balance, appear objectively to indicate the threat of the possibility of violence.

First, Bevilaqua's testimony suggests the defendant had a hostile relationship with preschool staff. Bevila-

[6] Although Bevilaqua and Kelly provided slightly different accounts of the defendant's actual words, given the surrounding context, "you better watch yourself" and "you better watch your back" can both be reasonably construed as a threat of physical violence.

[7] The fact that the defendant was locked out of the preschool at the time and, therefore, was unable to immediately carry out his threat is not determinative. See, e.g., *State* v. *Carter*, 141 Conn. App. 377, 401, 61 A.3d 1103 (2013) (threats while defendant was handcuffed), aff'd, 317 Conn. 845, 120 A.3d 1229 (2015); see also *United States* v. *Voneida*, 337 Fed. Appx. 246, 249 (3d Cir. 2009) (threats while defendant was incarcerated).

State *v.* Taveras

qua not only stated that the defendant had previously caused several "escalated interaction[s]" at the preschool but also specifically testified that she had previously seen the defendant act in a threatening manner. See *State* v. *Krijger*, supra, 313 Conn. 454 ("[w]hen the alleged threat is made in the context of an existing or increasingly hostile relationship, courts are more apt to conclude that an objectively reasonable speaker would expect that the statement would be perceived by the listener as a genuine threat"). The fact that employees of the preschool notified Bevilaqua of the defendant's late arrival even before it occurred, together with the fact that Bevilaqua immediately decided to return to the preschool because she "knew things would get escalated," indicates at the very least that this history fell far short of the "cordial and professional" relationship evinced by the record in *Krijger*.[8]

Although we agree with the defendant that evidence adduced by the state does not detail his precise physical movements during the incident in question, we cannot concur with his blanket assertion that there was "no evidence" of his conduct on that day. The evidence recounted previously in this opinion indicates that the defendant was irritated by the call he had initially received, that he became argumentative with staff after

---

[8] The Appellate Court based its own true threats analysis in the present case, in part, on the assumption that "there is . . . no evidence that Cherney had previously witnessed [the defendant's] prior behavior . . . ." *State* v. *Taveras*, supra, 183 Conn. App. 381. There is, however, testimony in the record indicating that the school's staff was generally aware of previous incidents involving the defendant. Specifically, in describing the reaction of her staff to the incident at issue in the present case, Bevilaqua testified as follows: "I think . . . people were concerned. It wasn't our first interaction with [the defendant], [i]t certainly wasn't our first escalated interaction, and people were concerned, [m]y staff were concerned . . . ." Bevilaqua also indicated that her staff had originally called to tell her about the defendant's late arrival "because this was not the first incident . . . ." In our view, it is more than reasonable to infer that Cherney, as manager at the preschool, would have been aware of those same incidents herself.

State *v.* Taveras

he arrived, and that his conduct eventually escalated
to the point that he was asked to leave. After exiting
through a set of locked doors, the defendant turned
around, yelled at Cherney, and then unsuccessfully
attempted to reenter the building. While neither Bevila-
qua nor Kelly was able to describe the exact manner
in which the defendant had attempted to open those
doors, the evidence suggests that he was acting in an
"enraged" and "intimidating" manner at that particular
moment in time. We agree with Judge Elgo's conclusion
that, in light of the foregoing, the trial court could have
reasonably found by a preponderance of the evidence
that the defendant's attempt to reenter the preschool
was, at least more likely than not, "aggressive in nature."
*State* v. *Taveras*, supra, 183 Conn. App. 386 (*Elgo, J.*, dis-
senting).

Another important factor in our independent analysis
is the reactions of the preschool's staff. Unlike the attor-
ney in *Krijger*, who waited two days to contact the
police, staff members in the present case immediately
contacted their supervisor, Bevilaqua, to tell her what
had occurred. Bevilaqua testified that, when she arrived
at the preschool shortly thereafter, she found that her
staff was "shaken up" and "concerned" by what had
transpired. Bevilaqua then immediately contacted the
police,[9] formally prohibited the defendant from reenter-
ing the preschool, began pursuing a restraining order,
and hired a police officer for additional security the

_____

[9] As Judge Elgo's dissent aptly observes: "Bevilaqua explained that the
preschool's 'internal policy' was to contact [the] police 'when something
escalates' to the point of '[s]taff being threatened.' Consistent with that
policy, Bevilaqua testified that she contacted the Danbury Police Depart-
ment, whose officers took statements from staff members. Questioned as
to how she differentiates between 'a small threat, like . . . I hate this place,'
and something 'larger' and more substantial, Bevilaqua testified that she
was 'trained to know the difference.' " *State* v. *Taveras*, supra, 183 Conn.
App. 386.

State *v.* Taveras

following day.[10] The immediate pursuit of these particular preventative measures reasonably suggests a specific fear of physical violence. The record now before us contains no suggestion that these measures were viewed, either contemporaneously or in hindsight, as an overreaction to the defendant's remarks.

Ultimately, the state's decision to present its case against the defendant through Bevilaqua and Kelly, neither of whom actually witnessed the defendant's conduct at the preschool on that particular day, makes this case a harder one. Prosecutors, in deciding to accuse individuals of committing breach of the peace in the second degree in violation of § 53a-181, and, then, judges and juries in making findings of fact, are required to separate incidents that reflect the normal agitations of life from those that are truly injurious to our society. In the absence of any direct evidence of the defendant's conduct, the trial court was left with only secondhand accounts to decide whether the defendant had crossed that line. Nevertheless, we agree with Judge Elgo's conclusion that, particularly in light of the lower standard of proof attendant to violations of probation, the evidence of the defendant's conduct and demeanor, together with the reactions that followed, is sufficient to support the trial court's implicit findings in that regard.

As an appellate tribunal, our constitutional obligation to independently examine the evidentiary record requires us to determine only whether a reasonable person in

---

[10] We note that the true threats exception is specifically designed to guard against the deadweight losses to our society that are unique to threats of physical violence. See *Haughwout* v. *Tordenti*, supra, 332 Conn. 559, 571 (true threats exception "protect[s] individuals from the fear of violence *and from the disruption that fear engenders*" (emphasis added; internal quotation marks omitted)); *State* v. *Pelella*, 327 Conn. 1, 17, 170 A.3d 647 (2017) ("[t]hreatening speech . . . works directly the harms of apprehension and disruption, whether the apparent resolve proves bluster or not and whether the injury is threatened to be immediate or delayed" (internal quotation marks omitted)).

State *v.* Taveras

the defendant's position would have known that the use of the phrase "you better watch your back," combined with his demeanor and other surrounding context, would be perceived as a serious threat of physical violence. See, e.g., *State* v. *Taupier*, supra, 330 Conn. 190–94. The state has shown through the evidence presented that those remarks were, in fact, viewed as a threat of violence by Bevilaqua and her staff. The defendant's choice of words, his previous interactions with preschool staff, the descriptions of his demeanor, and his attempt to reenter the preschool at the height of the altercation, collectively, point toward the conclusion that their perception was, if nothing more, objectively reasonable. As a result, we disagree with the Appellate Court's conclusion that the defendant's remarks warrant first amendment protection[11] and remand the case for consideration of the defendant's claims with respect to the admission of Bevilaqua's testimony. See footnote 2 of this opinion.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to consider the defendant's remaining claims on appeal.

In this opinion ROBINSON, C. J., and MULLINS, ECKER and KELLER, Js., concurred.

ROBINSON, C. J., concurring. I join the majority's well reasoned opinion in this case. I write separately only to highlight the importance of factual context in considering whether a statement, which facially may be susceptible to varying interpretations, rises to the level of a true threat, rendering it unprotected by the first amendment to the United States constitution. See, e.g., *Haughwout* v. *Tordenti*, 332 Conn. 559, 570–72,

[11] In light of this conclusion, we need not consider the state's claim that the defendant's conduct, as opposed to his speech, constituted a breach of the peace in the second degree.

State *v.* Taveras

211 A.3d 1 (2019); *State* v. *Taupier*, 330 Conn. 149, 193–94, 193 A.3d 1 (2018), cert. denied, U.S. , 139 S. Ct. 1188, 203 L. Ed. 2d 202 (2019); *State* v. *Krijger*, 313 Conn. 434, 454–55, 97 A.3d 946 (2014). The thoughtful analysis in the majority opinion aptly highlights how a defendant's conduct may provide the necessary context for a reasonable understanding of the meaning of his or her words. In my view, the majority opinion furnishes a cogent example of the searching and independent appellate review necessary to ensure that not every public expression of anger or frustration may be deemed to constitute criminal conduct, namely, a breach of the peace in the second degree in violation of General Statutes § 53a-181 (a).[1] See also General Statutes § 53a-181a (creating public disturbance is infraction).[2] I therefore join the majority's reversal of the judgment of the Appellate Court.

D'AURIA, J., with whom McDONALD, J., joins, concurring. Although I agree with much of the analysis and reasoning of the majority's opinion, I would eschew a true threats analysis in this case. Instead, I am convinced by the approach of Judge Elgo's dissenting opinion in the Appellate Court. See *State* v. *Taveras*, 183 Conn. App. 354, 382–92, 193 A.3d 561 (2018) (*Elgo*, *J.*,

---

[1] General Statutes § 53a-181 (a) provides in relevant part: "A person is guilty of breach of the peace in the second degree when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person: (1) Engages in fighting or in violent, tumultuous or threatening behavior in a public place; or . . . (3) threatens to commit any crime against another person or such other person's property . . . . For purposes of this section, 'public place' means any area that is used or held out for use by the public whether owned or operated by public or private interests."

[2] General Statutes § 53a-181a (a) provides: "A person is guilty of creating a public disturbance when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he (1) engages in fighting or in violent, tumultuous or threatening behavior; or (2) annoys or interferes with another person by offensive conduct; or (3) makes unreasonable noise."

dissenting). For the same reasons contained in her cogent dissenting opinion, I would reverse the Appellate Court's judgment and remand the case to that court, as the majority does. Accordingly, I respectfully concur.

———————————————